# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TODD AKINS, *et al.*,

      Plaintiffs,

      v.

ISLAMIC REPUBLIC OF IRAN, *et al.*,

      Defendants.

Civil Action No. 17-675 (BAH)

Chief Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

Over twenty years ago, on June 25, 1996, the Khobar Towers complex in Dhahran, Saudi Arabia, which housed military personnel from the United States and other allied forces, was bombed, causing extensive damage to the buildings, killing dozens of people, including nineteen American service members, and injuring many more.  Compl. at 3 & ¶ 28, ECF No. 1.  Among the injured are fifteen of the plaintiffs in this lawsuit, who, as members of the armed forces "survived the blast."  *Id.* at 3.  The plaintiffs also include twenty-three of the survivors' "immediate family members," and one family member of another service member, who was injured in the attack but is not a plaintiff.  *Id.*[1]  The plaintiffs allege that the defendants Islamic Republic of Iran ("Iran") and the Islamic Revolutionary Guard Corps ("IRGC") "caused and facilitated the terrorist attack at the Khobar Towers," *id.* ¶ 31, and seek damages under the Foreign Sovereign Immunities Act's ("FSIA") terrorism exception, 28 U.S.C. § 1605A.  Despite multiple efforts to effectuate service, the defendants have not entered appearances nor defended

---

[1] An additional plaintiff, Christopher Galletto, who had been stationed at Khobar Towers as a member of the U.S. Armed Forces but was on leave in Germany at the time of the attack, Pls.' Notice of Filing Supporting Decls., Attach 1, Decl. of Christopher Galletto ("Galletto Decl.") (June 27, 2018) ¶¶ 3–5, ECF No. 26-2 at 9, has asserted claims that are dismissed for the reasons discussed *infra* at notes 11 and 12.

against this action. The plaintiffs now seek entry of default judgment against both defendants. Pls.' Mot. for Default J. as to Liability ("Pls.' Liability Mot."), ECF No. 22; Pls.' Mot. for Default J. as to Damages ("Pls.' Damages Mot."), ECF No. 25. For the reasons detailed below, the plaintiffs' motions are granted in part and denied in part.[2]

## I.      BACKGROUND

"[T]he history of litigation" in this Court "stemming from the bombing of Khobar Towers . . . is extensive." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 167 (D.D.C. 2010) (Lamberth, J.) (citing *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 46–51 (D.D.C. 2006) (Lamberth, J.) and *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 248 (D.D.C. 2006) ("*Heiser I*") (Lamberth, J.)). The plaintiffs correctly point out that in "two of those prior decisions, the Court heard extensive evidence, including expert testimony, and held that the same two Defendants" named in the instant suit "were liable, jointly and severally, for the same June 25, 1996, terrorist attack on the Khobar Towers at issue here." Pls.' Mem. Supp. Pls.' Liability Mot. ("Pls.' Liability Mem.") at 8, ECF No. 22-1. In view of this prior litigation, the plaintiffs request that this Court "take judicial notice of prior findings of fact and supporting evidence imposing liability under Section 1605A (and its predecessor, Section 1605(a)(7)) on Iran and IRGC for providing material support and resources to the terrorists who attacked the Khobar Towers complex on June 25, 1996." Pls.' Liability Mem. at 10.

Rule 201 of the Federal Rules of Evidence authorizes a court to take judicial notice, on its own or at the request of a party, of adjudicative facts that are "not subject to reasonable dispute because" they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(a)–(c). "'[A]djudicative facts are simply the facts

---

[2]         The plaintiffs have requested appointment of a special master to hear the plaintiffs' damage claims, Pls.' Mem. Supp. Pls.' Liability Mot. at 16, ECF No. 22-1, which request is denied as unnecessary.

of the particular case' while 'legislative facts . . . are those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body.'" *NOW, Wash., D.C. Chapter v. Soc. Sec. Admin. of Dep't of Health & Human Servs*., 736 F.2d 727, 737 n.95 (D.C. Cir. 1984) (Robinson, J., concurring) (quoting Advisory Committee Note to FED. R. EVID. 201(a)). Rule 201 has been applied frequently in this jurisdiction for courts to take notice of, and rely on, facts found in earlier proceedings, "without necessitating the formality of having that evidence reproduced," *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012) (quoting *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 7 (D.D.C. 2011)), "even when those proceedings have taken place in front of a different judge," *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 191 (D.D.C. 2017) (citing *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009) ("Relying on the pleadings and the . . . findings of other judges in this jurisdiction.")). In this way, rather than require litigants to present such evidence anew in each lawsuit stemming from the same terrorist attack, courts have "determined that the proper approach is one 'that permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced,'" so that "courts may reach their own independent findings of fact" predicated "on judicial notice of the evidence presented in the earlier cases." *Anderson v. The Islamic Republic of Iran*, 753 F. Supp. 2d 68, 75 (D.D.C. 2010) (Lamberth, J.) (quoting *Rimkus*, 750 F. Supp. 2d at 172); s*ee also Foley*, 249 F. Supp. 3d at 191 (Kollar-Kotelly, J.) (finding same "approach appropriate" and "tak[ing] judicial notice of the requested findings"); *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 50 (D.D.C. 2012) (Lamberth, J.) (finding courts permitted "in subsequent related cases to rely upon the evidence presented in earlier litigation" (quoting

*Rimkus*, 750 F. Supp. 2d at 163)); *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 237 (D.D.C. 2012) (Lamberth, J.) (taking "judicial notice of the evidence presented in the earlier cases").

Thus, the factual evidence developed in other cases involving the same conduct by the same defendants is admissible and may be relied upon in this case. At the same time, the judicial findings derived from those facts are not dispositive here since courts must "reach their own, independent findings of fact in the cases before them." *Rimkus*, 750 F. Supp. 2d at 172. Persuaded that this common-sense approach is both efficient and sufficiently protective of the absent defendants' interests, this Court will adopt it and grant the plaintiffs' request to take judicial notice of the evidence presented in *Heiser I* and *Blai*s, as well as supplemental evidence provided by the plaintiffs. The evidence regarding the terrorist attack at issue is summarized first, followed by an overview of the procedural history of this case.

## A. THE KHOBAR TOWERS ATTACK

"The Khobar Towers was a residential complex in Dhahran, Saudi Arabia, which housed the coalition forces charged with monitoring compliance with U.N. security council resolutions." *Blais*, 459 F. Supp. 2d at 47. On June 25, 1996, a 5,000-pound truck bomb was detonated outside the Khobar Towers complex, and the resulting blast "sheared off the entire face of the Khobar Towers complex and shattered windows up to a half mile away." Compl. at 3. "The explosion killed dozens of persons including nineteen American servicemen," and "[h]undreds of others were injured and burned." *Id.* ¶ 28. "The investigation determined that the force of the explosion was the equivalent of 20,000 pounds of TNT," which was, according to the Department of Defense, "the largest non-nuclear explosion ever up to that time." *Blais,* 459 F. Supp. 2d at 47–48.

## B.     IRAN AND IRGC'S ROLE

"Iran is a foreign state and has been designated a state sponsor of terrorism pursuant to section 69(j) of the Export Administration Act of 1979 (50 U.S.C.A. § 2405(j)) continuously since January 19, 1984." *Blais*, 459 F. Supp. 2d at 47 (internal quotation marks omitted); *accord* Compl. ¶ 20.  The "IRGC has been described by expert testimony as 'a nontraditional instrumentality of Iran' that acts as 'the military arm of a kind of shadow government answering directly to the Ayatollah and the mullahs who hold power in Iran.'" *Rimkus*, 750 F. Supp. 2d at 173 (quoting *Blais*, 459 F. Supp. 2d at 47).  "[W]ith its own separate ministry, [it] has evolved into one of the most powerful organizations within Iran," and "functions as an intelligence organization."  Compl. ¶ 22.

The Khobar Towers bombing "was carried out by individuals recruited principally by a senior official of the IRGC, Brigadier General Ahmed Sharifi.  Sharifi, who was the operational commander, planned the operation and recruited individuals for the operation at the Iranian embassy in Damascus, Syria." *Blais*, 459 F. Supp. 2d at 48.  The truck bomb itself "was assembled at a terrorist base in the Bekaa Valley which was jointly operated by the IRGC and by the terrorist organization known as Hezbollah," and the attack "was approved by Ayatollah Khameini, the Supreme leader of Iran at the time." *Id.*

Under the "day to day oversight" of Dale Watson, then the deputy counterterrorism chief of the Federal Bureau of Investigation ("FBI"), the FBI, led by then-director Louis Freeh, "conducted a massive and thorough investigation of the attack, using over 250 agents." *Id.*  That investigation led to a June 21, 2001, indictment against "13 identified members of the pro-Iran Saudi Hezb[o]llah organization," which indictment "frequently refers to direction and assistance from Iranian government officials" in the plot to bomb the Khobar Towers. *Heiser I*, 466 F.

Supp. 2d at 252. The FBI also interviewed "six admitted members of the Saudi Hezbollah organization, who were arrested by the Saudis shortly after the bombing" and "admitted to the FBI their complicity in the attack . . . and admitted that senior officials in the Iranian government provided them with funding, planning, training, sponsorship, and travel necessary to carry out the attack on the Khobar Towers." *Id.* at 253. Those Saudi Hezbollah members provided information about "how each was recruited and trained by the Iranian government," and stated that Iran and the IRGC had "collectively" selected the target for the attack, and that "the actual preparation and carrying out of the attack was done by the IRGC." *Id.* One "told the FBI that IRGC gave the six individuals a large amount of money for the specific purpose of planning and executing the Khobar Towers bombing." *Id.* Importantly, "there was a great deal of cross-corroboration among the individuals' stories, even when each was interviewed by the FBI separately," and "in many instances the FBI was able to corroborate independently the statements made by the six individuals." *Id.* at 261–62. On the basis of the FBI's investigation, former Director Freeh "has publicly and unequivocally stated his firm conclusion . . . that Iran was responsible for planning and supporting the Khobar Towers attack," and Watson concurred "that there was Iran [] and IRGC involvement in the bombing." *Id.* at 253.

Dr. Patrick Clawson has provided expert testimony, "based on his involvement on a Commission investigating the bombing, his top-secret security clearance, his discussions with Saudi officials, as well as his academic research on the subject," that the Saudi Hezbollah organization was formed by Iran, and received military training from the IRGC. *Id.* Clawson concluded "that the government of Iran, [its Ministry of Information and Security], and IRGC were responsible for the Khobar Towers bombing, and that Saudi Hezbollah carried out the attack under their direction." *Id.*; *see also id.* at 260–64 (describing and finding credible expert

6

testimony regarding Iran and IRGC's involvement in the Khobar Towers attack). Clawson's conclusion about Iran's direct involvement in the Khobar Towers bombing is shared by Dr. Bruce Tefft, "one of the founding members of the CIA's counterterrorism bureau," who has testified that, based "on publicly available sources that were not inconsistent with classified information known to him from his time at the CIA and from his security clearances since that time," the Khobar Towers bombing "wouldn't have happened without Iranian support." *Blais*, 459 F. Supp. 2d at 48–49.

### C. THE INSTANT PLAINTIFFS

The plaintiffs in this action are U.S. nationals and include: (1) fifteen U.S. Armed Forces members, who were present at the Khobar Towers at the time of the bombing and "suffered physical and psychological injuries," Compl. ¶ 38; (2) twenty-three of their immediate family members; and (3) one family member of a service member survivor of the bombing who is not himself a plaintiff in this case. Each plaintiff and, where applicable, their family members, is described below.[3]

#### 1. *Todd Akins*

At the time of the attack, plaintiff Todd Akins, an F-15 avionics specialist serving a tour at Dhahran Air Force Base in Saudi Arabia, lived in the Khobar Towers complex. Pls.' Damages Mot., Attach 2, Decl. of Todd Akins ("Akins Decl.") (June 2018) ¶ 3, ECF No. 25-2 at 1.[4] While preparing for his night shift, he was "thrown across the room and against the concrete wall about 15 or 20 feet away from where [he] had been sitting." *Id.* ¶ 4. Though Akins was "dazed and

---

[3] Each plaintiff submitted two declarations, one in support of the motion as to liability and the other in support of the motion as to damages, with the latter declarations generally providing more comprehensive information. Consequently, the declarations submitted with the plaintiffs' motion as to damages are cited.
[4] Plaintiff Todd Akins submitted his declaration dated with only a month and year, as did three other plaintiffs, George C. Anthony, Andrew P. Blank, and Jerry Timothy Sasser, Jr. on behalf of the estate of Jason Allen Sasser.

confused," he helped his roommate out of their apartment and down the stairs to a "triage area." *Id.* There, Akins "had some pieces of glass removed from parts of [his] body," including his chin, head, back, knee, and calf, "and got some initial stitches." *Id.* Akins also suffered injuries to his "back and knee from when [he] was thrown against the wall," and believes he sustained a concussion as well. *Id.* ¶ 5. These injuries "still cause [him] a lot of pain on a day-to-day basis," and his "activities are limited," but "[t]he psychological impact may have been greater." *Id.* ¶¶ 6–7. Akins "suffered severe emotional distress . . . as a result of the terrorist attack," and has been diagnosed with post-traumatic stress disorder ("PTSD") and "rated as 70 percent disabled" by the Department of Veterans Affairs ("VA"). *Id.* ¶¶ 6, 8; *see id.*, Ex. B, VA, Baltimore Regional Office, Letter to Todd Akins, ECF No. 25-2 at 7–8.

### 2. *George C. Anthony*

On June 25, 1996, plaintiff George C. Anthony, was "serving with the 58th Fighter Squadron" and on "a tour of duty at the Air Force base in Dhahran, Saudi Arabia," where he lived in the Khobar Towers complex. Pls.' Damages Mot., Attach 2, Decl. of George C. Anthony ("Anthony Decl.") (June 2018) ¶ 3, ECF No. 25-2 at 14. While "walking out of [his] bedroom," Anthony "felt an immense blast that lifted [him] up and blew [him] back some 20 or 30 feet" where he "landed against a wall." *Id.* ¶ 4. After being helped out of the room by one of his roommates, Anthony jumped from a first-floor balcony "to get away from the building," and was "guided to a triage area" where Anthony was treated for a dislocated left shoulder. *Id.* ¶¶ 5–6. Upon his return to Eglin Air Force Base in Florida, Anthony was told that his shoulder required surgery in order to reattach some of his muscles, and that shoulder "still often hurts." *Id.* ¶ 7. One of Anthony's suitemates had been killed in the attack, and Anthony and his wife "spent a lot of time together" with the suitemate's widow "trying to help her get through her

grief." *Id.* ¶ 8. He "found that it was difficult to process what had happened and to come to grips with the fact that so many of [his] friends died," and believes that his inability "to process his emotions" about the attack was "a big reason" for his 2006 divorce. *Id.* ¶¶ 8–9. Anthony left the Air Force in 2011, and received an 80 percent disability rating, owing in part to his PTSD and lingering left shoulder issues. *Id.* ¶ 10; *id.*, Ex. A, Disabilities Rating, ECF No. 25-2 at 17. Anthony also suffers from "survivors' guilt, wondering how and why [he] survived when so many did not." *Id.* ¶ 11.

### 3. *Frank David Sills III*

On June 25, 1996, plaintiff Frank David Sills III "was an F-15 aircraft mechanic and crew chief" with the 58th Fighter Squadron, and was deployed to Dhahran Air Force Base and housed at the Khobar Towers complex. Pls.' Damages Mot., Attach 2, Decl. of Frank David Sills III ("Sills Decl.") (June 25, 2018) ¶¶ 3–4, ECF No. 25-2 at 18. Sills was cleaning up his suite in preparation for his departure the next day and, as he walked past his bathroom, the bomb "blew in everything from the bathroom, including porcelain from the bathtub, and hit [him] all over [his] left side." *Id.* ¶ 4. He was "thrown against the wall" and knew "immediately" that he "was bleeding profusely from the head," which he attempted to staunch with a pillow. *Id.* ¶ 5. As Sills attempted to make his way out of the building, he "realized that [his] left leg wasn't working properly" and was carried to the infirmary. *Id.* He was "evacuated to a local Saudi hospital by ambulance," and ultimately "taken to a U.S. military hospital in Ramstein," Germany, for further treatment. *Id.* ¶¶ 7–8. He sustained "a substantial amount of damage to [his] left calf where [he] lost some tissue and muscle," requiring six months of recovery before he was able to walk without crutches. *Id.* ¶¶ 9–10. Sills also required "several [] reconstructive surgeries to [his] face." *Id.* ¶ 10. He remained in the Air Force until 2014, and in 2015 was rated

60 percent disabled. *Id.* ¶ 11; *id.*, Ex. A, VA Letter to Frank Sills (Feb. 4, 2015), ECF No. 25-2 at 21. Sills suffers from "a generalized anxiety disorder" and "severe panic attacks and chronic sleep impairment," as well as survivors' guilt—"the sadness and grief of knowing that twelve of [his] close friends and co-workers never returned." *Id.* ¶¶ 11–12.

### 4.    *Kevin James Hurst*

On June 25, 1996, plaintiff Kevin James Hurst was a weapons load crew member with the 58th Fighter Squadron on a tour of duty at Dhahran Air Force Base, where he "was housed at [] Khobar Towers." Pls.' Damages Mot., Attach 2, Decl. of Kevin James Hurst ("Hurst Decl.") (June 28, 2018) ¶ 3, ECF No. 25-2 at 78. The bomb detonated while Hurst was asleep, and he "found [him]self elevated above [his] bed," as "[g]lass and pieces of rubble began raining down." *Id.* ¶ 4. With cuts from broken glass on his feet, he and a suitemate carried another suitemate downstairs and ultimately to a triage area. *Id.* ¶ 5. Hurst spent the next several hours trying in vain to find "certain of [his] friends," only "learn[ing] later the reason why [he] didn't see them—they had been killed in the blast and the collapse of [the] building." *Id.* ¶ 6. Since the bombing, he has been diagnosed with "bulging and protruding discs" causing lower back pain, and has "sought and received psychological counseling" for "symptoms of PTSD," including being "irritable . . . and more quick to anger." *Id.* ¶¶ 7–8.

### 5.    *Nicholas L. MacKenzie*

On June 25, 1996, plaintiff Nicholas L. MacKenzie was an aircraft maintenance crew chief in the 34th Fighter Squadron on a tour of duty at Dhahran Air Force Base, where he was housed in Khobar Towers. Pls.' Damages Mot., Attach 2, Decl. of Nicholas L. MacKenzie ("MacKenzie Decl.") (June 25, 2018) ¶ 3, ECF No. 25-2 at 93. He was asleep when the bomb detonated, and "was woken up by a flash of light, which was followed immediately by a loud

boom and a blast that sent [his] bed, with [him] in it, crashing against the wall of [his] room." *Id.*
¶ 4.  He and his suitemates, who each "suffered some injuries but were mobile," "checked for
injured servicemen on the floor below" and carried a badly-injured fellow airman "down six
flights of stairs to the triage area." *Id.* ¶ 5.  MacKenzie also received treatment at the triage area,
and "was later told [he] would be eligible for a Purple Heart but [he] declined because [he] knew
there were many more seriously wounded airmen." *Id.* ¶ 6.  He remained at Khobar Towers for a
"harrowing" two and a half months, before leaving the Air Force in 1997 and "bounc[ing]
around in several jobs, none lasting very long." *Id.* ¶¶ 7–8.  Though MacKenzie has, for
"personal reasons," "declined to seek or receive treatment for PTSD, and therefore ha[s] no
formal diagnosis," he has "many PTSD symptoms," including "startl[ing] easily" and "anger
management issues." *Id.* ¶ 9.  He has "tried to suppress or minimize" the "physical injuries and
psychological wounds from the terrorist attack at the Khobar Towers," but "know[s] that [his]
life was never the same after." *Id.* ¶ 10.

### 6. *Jason Porter Remar*

On June 25, 1996, plaintiff Jason Porter Remar was an aircraft maintenance crew chief in
the 58th Fighter Squadron on a tour of duty at Dhahran Air Force Base, where he was housed in
Khobar Towers.  Pls.' Damages Mot., Attach 2, Decl. of Jason Porter Remar ("Remar Decl.")
(June 28, 2018) ¶ 3, ECF No. 25-2 at 96.  He was "walking in [a] parking lot not far away" from
where the bomb detonated, and "felt a rumble and saw a cloud of dust and gravel approaching"
and "tried to run in the opposite direction, but it caught up to [him], knocked [him] down, and
carried [him] along the ground for about 15 or 20 feet." *Id.* ¶ 4.  Remar sought treatment at the
triage area for his "numerous cuts and abrasions," and does not "remember anything immediately
after that but [he] later woke up in a nearby Saudi hospital." *Id.* ¶¶ 4–6.  "Although . . . not . . .

hurt too bad, [he] stayed there to stay with [his] friends who were," and over the following days "learned the names of [his] friends who were either very badly hurt or killed," which "was very painful." *Id.* ¶¶ 6–7. Remar remained in the Air Force, but "was not the same person" and "struggled with major depression" for which he "was prescribed medication" that he still takes. *Id.* ¶ 8. While he "ha[s] learned to try to cope with what happened in [his] own way," and "tr[ies] not to think about" the attack, he "largely" attributes his depression to the bombing. *Id.* ¶¶ 8–9.

### 7. *Charles Blank and Four Family Members*

On June 25, 1996, plaintiff Charles Blank was serving his third tour of duty at the Dhahran Air Force Base as a member of the 34th Fighter Squadron, and was in his living room with three suitemates at the time of the bombing. Pls.' Damages Mot., Attach 2, Decl. of Charles Blank ("Charles Blank Decl.") (June 28, 2018) ¶¶ 3–4, ECF No. 25-2 at 23. "The entire wall came crashing in," and Blank had to be helped out from under "the frame of the glass door" before "crawl[ing] into the hallway." *Id.* ¶ 4. He and his suitemates "checked each other's injuries," at which point Blank noticed "a puddle of blood under" him, which "seemed to be from [his] legs." *Id.* ¶ 6. Before seeking medical help for himself, Blank "check[ed] for injured airmen" in a nearby suite, and "saw another pilot who was squirting blood from his neck." *Id.* ¶ 7. While trying to find aid, he assisted others in carrying other injured airmen, including at least one who died while Blank was helping to carry him to triage. *Id.* Blank ultimately required 22 stitches in his leg, and, for nearly ten years, he and his wife "were still picking and pulling pieces of glass out of [his] legs as they gradually worked their way to the skin surface." *Id.* ¶¶ 9, 14. He remained in the Air Force before joining the Air National Guard, but still experiences

flashbacks to the Khobar Towers bombing, which are triggered by news of "new terrorist attack[s]," or by movie "scenes of explosions and flying glass." *Id.* ¶¶ 15–18.

Four of Blank's family members are plaintiffs in this lawsuit: his wife, Linda Kay Blank, son, and two siblings. Blank's wife had not yet heard the news of the bombing when she received "a phone call from [Blank] letting [her] know he was alive. [She] was shaken" but Blank was unable to "talk for long," and she did not hear from him again for "a[ ]long time." Pls.' Damages Mot., Attach 2, Decl. of Linda Kay Blank ("Linda Blank Decl.") (June 28, 2018) ¶¶ 3–4, 6, ECF No. 25-2 at 31. The "days immediately after the explosion were very difficult," as she heard from other spouses that her husband "was hurt and that it was serious," and she "worried that he might be badly hurt but had been trying to minimize that or just spare" her in his phone call. *Id.* ¶¶ 5, 7. As a result of the attack, Linda Blank decided to "quit [her] job so that [she] could stay home with" the couple's son, because "in case anything happened to either of [them], [they] didn't want [him] to grow up without really knowing either parent." *Id.* ¶ 8. In addition to helping "pull pieces of glass from Charles'[s] body for years after the attack," Linda has "gone through everything with him" emotionally as well, even once reading the "diary where [Charles] wrote down much of what happened . . . . It was truly horrifying to read. [She] realized that he was able to write some things that were too hard to talk about." *Id.* ¶¶ 10–11.

Nathan Blank is Blank's son, and, "[a]lthough [he] was very young at the time of the attack, [he] suffered emotional distress and mental anguish throughout [his] childhood because of the devastating effect the attack had on [his] father, [his] mother, and [his] whole family." Pls.' Damages Mot., Attach 2, Decl. of Nathan Blank ("Nathan Blank Decl.") (June 28, 2018) ¶¶ 3, 5, ECF No. 25-2 at 34. "The effect this terrorist attack has had on [him] will be everlasting.

[Nathan Blank] grew up seeing [his] father's scars and . . . witness[ing] the anguish he has when retelling the events of that day." *Id.* ¶ 6.

Deborah Millrany is Blank's sister, and at the time of the Khobar Towers attack "was working at an airline counter where [she] could see the news on television, and saw some of the reports coming in of an explosion at the Khobar Towers residential complex." Pls.' Damages Mot., Attach 2, Decl. of Deborah Millrany ("Millrany Decl.") (June 27, 2018) ¶¶ 2, 4, ECF No. 25-2 at 36. Knowing that her brother "was stationed in Saudi Arabia [she] became very concerned that he may have been caught in that explosion," which concern increased when she "called his wife Linda and could not initially get through." *Id.* ¶ 4. Millrany "was fiercely protective of" her brother growing up, and they "remained close in adult life." *Id.* ¶ 5. She notes that Blank "became quieter" after returning from Saudi Arabia, and "know[s] he kept a lot in and never wanted to talk about the details of what he experienced. He was almost apologetic about receiving a Purple Heart because he said that there were a lot of airmen who were much more seriously hurt than he was." *Id.* ¶ 6.

Andrew P. Blank is Blank's brother, and was "always very close" with Blank, who "taught [Andrew] how to ride a bike and to play hockey, which [they] played together for over 20 years." Pls.' Damages Mot., Attach 2, Decl. of Andrew P. Blank ("Andrew Blank Decl.") (June 2018) ¶ 3, ECF No. 25-2 at 29. After initially hearing about the bombing, Andrew Blank "did not hear that [Blank] was injured but OK for about twelve hours after that initial phone call," and the wait "was agonizing" as he "saw the rubble and destruction" on the news, along with "reports of deaths and serious injuries." *Id.* ¶ 5. The two brothers "had a close bond" and Andrew Blank's "fears for his [brother's] safety and survival were profound. Although [he] was relieved when [he] eventually heard that [Blank] had survived," the experience "caused

[Andrew] considerable emotional distress.  *Id.* ¶ 6.  When Blank returned home, Andrew Blank "could tell that the experience had changed him.  He became less open, less optimistic, somewhat withdrawn and a harder person in general.  To this day he doesn't want to talk about what happened there, and doesn't want the Purple Heart he was awarded for his injuries to be displayed in his house," all of which has made Andrew "sad" and "sorry to see the effect" the attack had on Blank.  *Id.* ¶ 7.

**8.      *John Gaydos and Three Family Members***

On June 25, 1996, plaintiff John Gaydos was an avionics maintenance specialist in the Air Force serving a rotation at the Dhahran Air Force Base, where he was housed at the Khobar Towers complex.  Pls.' Damages Mot., Attach 2, Decl. of John Gaydos ("John Gaydos Decl.") (June 19, 2018) ¶¶ 3–5, ECF No. 25-2 at 38.  He was on a couch in his suite's common area when he heard a rumble, and then "experienced a huge blast wave."  *Id.* ¶ 6.  Gaydos was helped out of the building by one of his suitemates, and remembers putting his hand to his ear and feeling "nothing but blood," and experiencing "tunnel vision," but does not "remember much else after that" but knows he "was helped/carried to medical assistance."  *Id.* ¶ 8.  While receiving "emergency medical care in a triage area that had been set up on a bus," Gaydos "lost consciousness but [] remember[s] waking up more than once to notice that [he] was receiving CPR," and "[o]ne of the medics kept talking to [him] to try [to] make sure that [he] did not lose consciousness again."  *Id.* ¶ 9.  He was "taken to a small infirmary nearby," where he "saw several body bags," and observed a "female Captain with one eye hanging out of its socket.  She asked one of the medics if it could be saved.  He said no, and she calmly proceeded to cut it off with ordinary scissors, asked to have it bandaged, and then proceeded to help others."  *Id.*  Gaydos was then evacuated to a nearby hospital, and then to a military hospital in Germany,

where he received surgical treatment for injuries that "included broken bones in [his] skull and left elbow; a severed nerve and ulnar artery damage in [his] left arm; extensive shrapnel wounds to [his] face, arms, and legs, where the glass from the shattered sliding glass doors hit [his] body." *Id.* ¶¶ 10–11.

Gaydos was hospitalized after returning to the United States, and "received additional medical treatment," but still "suffer[s] substantial pain in [his] legs and arms almost every single day." *Id.* ¶¶ 10, 12. Gaydos "cannot walk any significant distances and cannot stand still for any length of time. [His] left arm has lost much of its mobility and function, and [his] left hand has lost feeling." *Id.* ¶ 12. Those physical symptoms, however, "are minor compared to the mental and emotional after-effects of the terrorist attack." *Id.* ¶ 13. Gaydos has "had a hard time finding or retaining employment," and has "constant recurring nightmares and flashbacks," even injuring his wife while flailing during a nightmare. *Id.* In 2008, he was evaluated as "'exhibiting severe symptoms associated with posttraumatic stress disorder' and [his] 'related major depressive disorder and panic disorder,'" *id.* ¶ 14; *see id.*, Ex. A, Psychological Evaluation of John Gaydos by Phoebe A McLeod, PhD (Mar. 8, 2008), ECF No. 25-2 at 43–45, and was rated as 80 percent disabled, *id.*, Ex. B, VA Rating Decision (Sep. 23, 2015), ECF No. 25-2 at 47. Gaydos "continue[s] to have flashbacks," "nightmares," and "difficulty sleeping," but has "started to receive therapy" and regularly "attend[s] a PTSD support group." *Id.* ¶¶ 16–17. Through this treatment, he has become more aware of the ways in which his PTSD symptoms— "irritability, shortness of temper, and sometimes abusive behavior"—have "adversely affected" his family and "been a great burden to them." *Id.* ¶ 17.

Three of Gaydos's family members are plaintiffs in this lawsuit: his wife, Barbara Gaydos, son, and daughter. Gaydos's wife was at home with their two children when her father

called to tell her "that something had happened at the Khobar Towers complex." Pls.' Damages Mot., Attach 2, Decl. of Barbara Gaydos ("Barbara Gaydos Decl.") (June 19, 2018) ¶¶ 3–4, ECF No. 25-2 at 50. She "learned that there had been a bomb blast and that not all the members of [Gaydos's] unit had been accounted for," but "heard nothing about [him] for two full days," during which time she "did not know if he was alive or dead, or whether he was badly injured." *Id.* ¶ 5. After Gaydos came home, Barbara observed "changes in John" in addition to "his obvious and extensive physical injuries, which required him to use a wheel chair for several months." *Id.* ¶ 7. Though Gaydos "had been a very physical, outgoing, and outdoorsy young man, enjoying social interactions and outdoors activities," upon "his return, he did not want to go anywhere and became more guarded and distant," was "often . . . hunkered down in bed, even during the middle of the day." *Id.* ¶ 8. "John also suffered from disordered sleep and nightmares," and Barbara Gaydos believes that she sustained a concussion when, during a nightmare, Gaydos "accidentally hit [her] in the head while he was flailing about." *Id.* ¶ 9. She has "no doubt that John's PTSD caused by the terrorist bombing ha[s] caused a serious strain on [their] marriage and adversely affected [their] family life," including inflicting "considerable emotional distress" on her and their children, who "seem to have suffered secondary or indirect PTSD." *Id.* ¶ 13.

Ethan Gaydos is John and Barbara Gaydos's son, and was "about two and a half years old" at the time of the bombing and does not "have a clear recollection of learning" about it, though he does "recall a vague sense that things were not right and that [his] mother was upset." Pls.' Damages Mot., Attach 2, Decl. of Ethan Gaydos ("Ethan Gaydos Decl.") (June 22, 2018) ¶¶ 3–4, ECF No. 25-2 at 53. As Ethan Gaydos grew up, he "became aware that [his father] was troubled by [] demons," and "[i]t was not unusual to be woken up in the middle of the night by

hearing [him] shouting during one of his nightmares." *Id.* ¶ 5. "In general, [his] father was distant and uninvolved," though "at times he would get angry at [Ethan] and shout at [him], although he would alter apologize. Because of his injuries and physical limitations, he was not able to play with [Ethan] the way a lot of other dads did." *Id.* ¶ 6. Ethan Gaydos has "no doubt that [his] emotional development and growth were adversely affected by the PTSD that affected [his] father after the terrorist attack. Although [he] was very young at the time of the attack, [he] suffered severe emotional distress and mental anguish throughout [his] childhood because of the devastating after-effects the attack had on" his parents and their "whole family." *Id.* ¶ 8. The emotional distress of the attack itself continued "throughout [his] childhood and to this day," and "[t]he psychological after-effects of the attack were even more difficult," as his "whole family has been deeply and adversely affected" by Gaydos's "physical and psychological limitations and deficits." *Id.* ¶ 9.

Elizabeth Gaydos is John and Barbara Gaydos's daughter, and, like her brother, Ethan, she "was very young at the time of the attack and do[es] not remember what happened around that time." Pls.' Damages Mot., Attach 2, Decl. of Elizabeth Gaydos ("Elizabeth Gaydos Decl.") (June 22, 2018) ¶¶ 3–4, ECF No. 25-2 at 56. "The attack caused [her] mother to experience severe emotional distress when it happened, and caused [her] family great emotional distress not only when it happened, but also throughout [her] childhood and to this day. The serious injuries suffered by [Gaydos] limited his ability to participate in our family life and to be the same person he was before the attack. The psychological after-effects of the attack were even more difficult for" the family. *Id.* ¶ 8. Growing up, Elizabeth Gaydos "became aware that it was very difficult to try to get any attention from [her] father, and that [her] mother also had little time for [her]. [She] felt neglected and started to engage in self-harming behaviors," and received "anger and

blame" from her parents rather than "support or sympathy." *Id.* ¶ 4. Elizabeth Gaydos also "seem[s] to have picked up some 'secondary' symptoms of [her] dad's PTSD," as both have similar "large startle[d] reaction[s]" when, for example, a plate is dropped at a restaurant. *Id.* ¶ 5.

### 9. *Matthew G. Spicer and Three Family Members*

On June 25, 1996, plaintiff Matthew G. Spicer was an "F15 avionics technician assigned to the 58th Fighter Squadron" serving a tour of duty at Dhahran Air Force Base. Pls.' Damages Mot., Attach 2, Decl. of Matthew G. Spicer ("Matthew Spicer Decl.") (June 25, 2018) ¶ 3, ECF No. 25-2 at 58. That evening, he "shared a smoke with [his] good friend Peter Morgera," who was killed in the bombing, before returning to his suite. *Id.* ¶ 4. The blast occurred while Spicer was sitting on a couch, and he "remember[s] a shaking like an earthquake and a feeling like thunder was going through [him], and that it became dark all of a sudden," and he was struck in his legs by fragments of the suite's glass doors as they blew in. *Id.* ¶ 5. Believing they had been hit by a missile, and thinking more might follow, he and his suitemates "shelter[ed] in place for a while" before going downstairs to the triage area that had been "set up where the dining area was," and Spicer noticed some of his "friends being carried out . . . in very bad shape, screaming in pain." *Id.* ¶ 6.[5] After receiving "some first aid for [his] leg wounds," Spicer remained at Dhahran "for several more days" before traveling back to the United States, and during that time he "helped load the caskets of [his] comrades who did not" survive "for their final journey back to Dover Air Force base." *Id.* ¶ 7. Spicer "often think[s]" of those who died in the bombing, and "sometimes ha[s] 'flashbacks'" where he "suddenly re-live[s] some of the sights and sounds of that day," and states that he also "sometimes become[s] randomly emotional." *Id.* ¶ 9. "For personal reasons," he "do[es] not want to go to the VA for any sort of psychological evaluation

---

[5]     One of those friends was Cielito Valencia, the lead plaintiff in *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1 (D.D.C. 2010).

or treatment" and therefore does not have any formal PTSD diagnosis, but instead "'self-medicate[s]' with alcohol," though he does receive "a lot of help and emotional support" from his brother, and has been able to speak to friends about "these experiences and their after-effects." *Id.* ¶¶ 9–10.

Three of Spicer's family members are plaintiffs in this lawsuit: his ex-wife, Cathy Eunha Kim Spicer-Lindsy, son, and brother. Spicer-Lindsy was married to Matthew Spicer at the time of the attack on Khobar Towers, and "was living on base housing with [their] infant son." Pls.' Damages Mot., Attach 2, Decl. of Cathy Eunha Kim Spicer-Lindsy ("Cathy Spicer-Lindsy Decl.") (June 28, 2018) ¶¶ 3–4, ECF No. 25-2 at 61. After hearing about the bombing of Khobar Towers, she "became very anxious and distraught," "suffer[ing] severe emotional distress and mental anguish," and remembers "as sheer torture" the time during which she waited to find out that Spicer "had survived and was not seriously injured." *Id.* ¶¶ 4–5, 8. When he returned, however, "he was a changed man. He had become moody and withdrawn [and] awoke at night with bad dreams and night sweats." *Id.* ¶ 6. Spicer-Lindsy "thought he just needed some time to process what had happened, but things did not improve with time," and Spicer "became abusive toward [her], both verbally and otherwise." *Id.* Although they "had not had any real problems in [their] marriage before" the bombing, their marriage "deteriorated" after, due to "problems" with "Matthew's mental state . . . caused by the bombing and its after-effects," and the two separated in 1999 before divorcing in 2005. *Id.* ¶¶ 6–7; *see also id.* ¶ 9.

Cathy Spicer-Lindsy also submitted a declaration on behalf of her and Spicer's son, Christian William Spicer, "who has autism and is not verbal," and for whom Spicer-Lindsy serves as guardian. Pls.' Damages Mot., Attach 2, Decl. of Christian William Spicer ("Spicer-

Lindsy for Christian Spicer Decl.") (June 28, 2018) ¶ 2, ECF No. 25-2 at 66.[6]  Christian Spicer

"was too young to understand what was happening" after the bombing, but "he suffered from the

after-effects."  *Id.* ¶ 5.  "Although he had been a good father, and tried to continue, Matthew

ended up largely exiting Christian's life around the 4th grade.  After [their] separation and

divorce, Matthew's attempts to reach out to Christian were few and far between," and Spicer-

Lindsy "believe[s] Christian suffered significant harm from the lack of his father's attention, care

and concern."  *Id.* ¶ 6.

Christopher G. Spicer is Spicer's brother, and on the day of the attack he "received a

phone call from [his] aunt telling [him] that something had happened at [] Khobar Towers," but

that "she did not know what had happened" to Spicer.  Pls.' Damages Mot., Attach 2, Decl. of

Christopher G. Spicer ("Christopher Spicer Decl.") (June 28, 2018) ¶¶ 3–4, ECF No. 25-2 at 64.

He was "immediately very worried and anxious" while awaiting news about Spicer, and his

"fears concerning his survival and safety were intense," causing him "great emotional distress."

*Id.* ¶¶ 4, 8.  When Spicer returned, Christopher Spicer observed that "he had been through a lot"

and "seemed like a different person," and "sensed some psychological scars" in addition to the

"physical scars on [his brother's] legs."  *Id.* ¶ 5.  Spicer "was withdrawn and moody at times,"

and "was also emotionally distant."  *Id.* ¶ 6.  After Spicer and Cathy Spicer-Lindsy divorced,

---

[6]      The two declarations submitted by, and on behalf of, Christian Spicer contain discrepancies about his abilities and knowledge.  *Compare* Spicer-Lindsy for Christian Spicer Decl. ¶ 5 ("Christian was too young to understand what was happening."), *with* Pls.' Liability Mot., Attach. 2, Decl. of Christian William Spicer (Feb. 2018) ¶ 5, ECF No 22-2 at 15 ("I suffered severe emotional distress and mental anguish when I first heard news of the attack and of the many deaths and casualties there because I knew that my father was serving there.  I saw the pictures of the rubble and the destruction after the terrorist attack as reported on television news."); *compare* Spicer-Lindsy for Christian Spicer Decl. ¶ 2 (stating that Christian Spicer "has autism and is not verbal"), *with* Pls.' Liability Mot., Attach. 2, Decl. of Christian William Spicer (Feb. 2018) ¶ 1 (attesting that he was "competent to testify about the facts personally known to" him).  Despite these discrepancies, the Court relies on the declaration submitted by Christian Spicer's mother on his behalf, *see* Spicer-Lindsy for Christian Spicer Decl. ¶ 2 ("I am the guardian for my son Christian William Spicer, who has autism and is not verbal.  I am authorized to make this Declaration on his behalf."), finding that this "evidence [is] satisfactory to the [C]ourt," 28 U.S.C. § 1608(e), given that Christian Spicer is "disabled," Compl. ¶ 14.

Spicer "came to live with" Christopher Spicer, who "was glad to be able to help him during this difficult time." *Id.* The brothers are eleven months apart in age, and "had always been very close," so "it hurt [Christopher] to see the changes and difficulties [Matthew] went through as a result of the Khobar Towers bombing," and Spicer's "psychological trauma . . . became a burden and problem for [their] whole family." *Id.* ¶¶ 7–8.

### 10. *Jerry Timothy Sasser, Jr. and Three Family Members*

On June 25, 1996, plaintiff Jerry Timothy Sasser, Jr. "was just hours from finishing [his] first tour of duty and was getting ready to go home" from the Dhahran Air Force Base, where he "was present at the Khobar Towers" complex. Pls.' Damages Mot., Attach 2, Decl. of Jerry Timothy Sasser, Jr. ("Jerry Sasser Jr. Decl.") (June 26, 2018) ¶¶ 3–4, ECF No. 25-2 at 68. While returning to his room, he "stopped briefly at the room" of three fellow airmen, but declined their invitation to join their card game. *Id.* ¶ 4. All three were killed in the blast. *Id.*[7] Sasser "was [on a] phone call home . . . when all the lights went out and [he] heard what sounded like a train, a sonic boom, and an earthquake all at once," and he lost consciousness. *Id.* ¶ 5. "When [he] came to, it appeared that [he] had been thrown forcibly against the wall," and his "vision was grayed out and [he] couldn't hear anything." *Id.* Once his senses returned, Sasser "spent several hours assisting the wounded and trying to find survivors," going "back into the building several times until it became clear that there were no additional survivors." *Id.* ¶ 6. Even though he "knew there would be no more," he felt he "had to lie to friends who were still hoping to find additional survivors." *Id.* While he ignored his own injuries at first, Sasser had sustained "numerous cuts, abrasions, and contusions," "many fragments of glass were embedded in [his] body," and, as a result of "being thrown against the wall by the blast, he also "had herniated and

---

[7] One of those three was Joseph Rimkus, whose father was the plaintiff in *Rimkus*, 750 F. Supp. 2d at 167.

ruptured discs in [his] back, which have required several major surgeries." *Id.* ¶ 7. Sasser

remains "in constant pain from these injuries," and "take[s] pain medications every day to

manage the pain," but "[t]he psychological after effects have been even more devastating." *Id.*

¶¶ 8–9.

Sasser is "rated as 100 percent disabled" by the VA, and has "received and continue[s] to

receive treatment for traumatic brain injury, posttraumatic stress disorder, and depression." *Id.* ¶

9; *id.* Ex. A, Letter from VA to Jerry Timothy Sasser re Disability Rating (Apr. 24, 2017), ECF

No. 25-2 at 72. These psychological effects have caused Sasser's family relationships to

"deteriorate[]," and he "couldn't keep a job," "picked fights with strangers at bars," and "started

doing drugs, smoking, and drinking heavily." *Id.* ¶ 10. "Although [he] eventually sought and

received some therapy, [his] family relationships were damaged almost beyond repair," and his

"first marriage ended in divorce." *Id.* ¶ 11. Sasser is now "happily remarried," but worries that

he "subject[s] [his] wife to [his] own personal demons," noting that she "has seen [him] in a ball

of tears, hiding from fireworks," and "deliver[ing] a tear-filled speech, honoring [his] friends

who lost their lives." *Id.* ¶ 12. He "suffered severe emotional distress in addition to [his]

physical injuries as a result of the terrorist attack"—"trauma" that "is a nightmare that no 20-year

old kid should ever have to endure. It ruined [his] life." *Id.* ¶¶ 13–14.

Two of Sasser's family members are plaintiffs in this lawsuit: his parents as well as his

brother's estate. Jerry Timothy Sasser, Sr. is Sasser's father, and learned about the Khobar

Towers attack from the evening news, and "at about the same time" he "received a call from" his

son "letting us know that he had survived." Pls.' Damages Mot., Attach 2, Decl. of Jerry

Timothy Sasser, Sr. ("Jerry Sasser Sr. Decl.") (June 28, 2018) ¶¶ 2–4, ECF No. 25-2 at 73.

"When Jerry returned," however, Sasser, Sr. "realized he was not the same active and outgoing

young man he had been. He was withdrawn and apathetic. He had used to come to see us frequently but now he did not and even avoided contact with us. He did not return phone calls." *Id.* ¶ 5. Sasser, Sr. saw that his son "was not taking steps to get treatment or help" and worried that "he was throwing his life away," until "[f]inally [he] . . . insisted [Sasser] get some professional help" or else Sasser, Sr. "would stop helping him as well." *Id.* ¶¶ 5–6. Though "gradually [Sasser has] improved somewhat," he has "never [been] the same," causing Sasser, Sr. "considerable grief and anguish," noting that he "felt we had lost a loving and vital family member" due to Sasser's "continuing physical and psychological issues." *Id.* ¶¶ 6–8.

Deborah Homs is Jerry Timothy Sasser, Jr.'s mother, and learned about the Khobar Towers attack from the evening news, but the "news had not really registered with" her when she "received a phone call" from Sasser saying that he had survived. Pls.' Damages Mot., Attach 2, Decl. of Deborah Homs ("Homs Decl.") (June 28, 2018) ¶¶ 2–4, ECF No. 25-2 at 77. Her happiness that Sasser "was ok" was tempered by the knowledge that "he must have gone through a lot, and [she] felt bad for him and his fellow airmen when [she] saw the devastation on tv," and she "suffered severe emotional distress when" she "saw pictures of the rubble and devastation on television news reports." *Id.* ¶¶ 4, 9. "When Jerry returned, he was not at all the same person. He was in bad shape" and "distanced himself from his family." *Id.* ¶ 5. Though he "has gradually improved," "[i]t has broken [Homs's] heart to see what happened to him." *Id.* ¶¶ 7–8. She "feel[s] [she] lost the happy, optimistic young man [who] had been so involved with his family, his community, and his Church." *Id.* ¶ 8.

Kimberly Watters Sasser is the widow of Jerry's younger brother, Jason Allen Sasser, and a declaration on Jason's behalf has been submitted by Sasser. Pls.' Damages Mot., Attach 2, Decl. of Jerry T. Sasser, Jr. on Behalf of the Estate of His Deceased Brother, Jason Allen Sasser

("Jason Sasser Decl.") (June 2018) ¶¶ 2–3, ECF No. 25-2 at 75; *see* Motion to Substitute Party, ECF No. 28; Minute Order (July 24, 2018).[8] The brothers "often played together as kids and were very close," and Jason "looked up to" Sasser, but "[t]hat all changed when [Sasser] came home after the Khobar Towers attack." *Id.* ¶¶ 5–6. Sasser "just shut down emotionally and Jason very much missed having [an] involved older brother," and "soon turned to drugs and alcohol to numb the pain of losing [Jerry's] affection." *Id.* ¶¶ 6–7. Jason Sasser "became rebellious and often blamed [his brother] for his life because [Jerry] left him behind," and "was in so much pain over the loss of his big brother emotionally." *Id.* ¶ 7. Before Jason Sasser's death, the brothers had "just recently started growing closer" after more than 20 years of emotional distance. *Id.* ¶ 7.

### 11. *Gregory Eric Leinenbach and One Family Member*

On June 25, 1996, plaintiff Gregory Eric Leinenbach was a member of the 58th Fighter Squadron on a tour of duty at Dhahran Air Force Base, where he was housed in Khobar Towers. Pls.' Damages Mot., Attach 2, Decl. of Gregory Eric Leinenbach ("Leinenbach Decl.") (June 19, 2018) ¶¶ 3–4, ECF No. 25-2 at 81. He was asleep when the bomb detonated, and "was woken up by a loud blast, and flying debris." *Id.* ¶ 6. Though his way out of his room was "blocked by toppled furniture and debris," Leinenbach was able to evacuate with help from his suitemates, and made his way to a "triage facility, where [he] received initial first aid for [his] wounds," which included cuts on his legs from "pieces of glass [that] were embedded in them." *Id.* ¶¶ 6–7. "The rest of that night was a blur," and over the following days he "received word on who the fatalities were," including several of Leinenbach's friends, which "affected [him] deeply." *Id.* ¶¶

---

[8] Jason Sasser "died in a tragic accident on April 1st, 2018," Jason Sasser Decl. ¶ 3, and his wife, Kimberly Watters Sasser, in her capacity as personal representative of the Estate of Jason Allen Sasser, has been substituted as named party pursuant to Federal Rule of Civil Procedure 25(a), *see* Minute Order (July 24, 2018).

8–9.  Upon his return to the United States, he received additional medical treatment, "including removal of more pieces of glass embedded in [his] legs and stitches to repair the wounds," and pieces of glass continued to surface for "many months after" as well.  *Id.* ¶ 10.

After leaving the Air Force in 2003, Leinenbach had "difficulty sleeping, difficulty concentrating, . . . and had some trouble with relationships with [his] co-workers," and "found it difficult to maintain employment for any significant amount of time," and has been unemployed since 2011.  *Id.* ¶¶ 12, 15.  At his wife's urging, he sought help from the VA, where he was diagnosed with PTSD and has "received therapy, counseling, and medication."  *Id.* ¶ 13.  He is rated "50 percent disabled" by the VA.  *Id.*  Leinenbach "suffered severe emotional distress . . . as a result of the 1996 terrorist attack," which "haunt[s] [him] to this day."  *Id.* ¶ 16.  He is "afraid of crowds and avoid[s] them, [] startle[s] easily, and sleep[s] badly, with frequent and recurring nightmares," and "anger[s] easily," all of which "have had a persistent negative affect on [his] life and [his] relationships within [his] family."  *Id.* ¶¶ 16–17.

Plaintiff Joy Leinenbach is Gregory Leinenbach's wife, and was at work when she received a phone call from her father-in-law telling her that there had been an explosion at Khobar Towers, but no specific "information about Greg."  Pls.' Damages Mot., Attach 2, Decl. of Joy Leinenbach ("Joy Leinenbach Decl.") (June 19, 2018) ¶¶ 3, 6, ECF No. 25-2 at 87.  She "was immediately gripped by tremendous anxiety and emotional distress," and "worried" that her husband, to whom she "was very close," had been "severely injured or killed," and did not learn until "about a day and a half" later that he "was injured but ok"—a wait that was "sheer agony for [her]."  *Id.* ¶ 7.  Joy Leinenbach "sensed very quickly that [her husband] was changed" after he returned home, and he "grew more distant with time, and became more easily irritated and angered," including with their children.  *Id.* ¶ 8.  He still "has trouble sleeping and has

frequent nightmares," and his "anxiety causes [Joy Leinenbach] to have anxiety" as well, and both have experienced "continued emotional distress and anguish" due to "Gregory's PTSD." *Id.* ¶ 9.

### 12. *Eric Dale Ziegler and One Family Member*

On June 25, 1996, plaintiff Eric Dale Ziegler was an aircraft maintenance crew chief in the 58th Fighter Squadron on a tour of duty at Dhahran Air Force Base, where he was housed in Khobar Towers. Pls.' Notice of Filing Supporting Decls., Attach 1, Decl. of Eric Dale Ziegler ("Ziegler Decl.") (June 30, 2018) ¶¶ 3–4, ECF No. 26-2 at 1. At the time of the bombing, he "was sitting on [his] bed," but the force of the blast sent him "across the room." *Id.* ¶ 4. "[W]hen [he] came to, [he] was crawling to try to get out," though he "couldn't walk[,] and could barely see." *Id.* ¶ 6. A friend "helped carry" Ziegler out of his suite, and they "tried to help" one of Ziegler's suitemates as well, "but he was too badly injured to be moved," and Ziegler "held him and stayed with him until he died." *Id.* Ziegler was the only one of his suitemates to survive the attack. *Id.* ¶ 4. He was taken to a triage area, and then to a series of hospitals before "[e]ventually [he] was airlifted back to" the United States, where he received treatment for "deep cuts and abrasions to [his] face, scalp, and right eye, right upper arm, right knee and back," as well as "nerve damage" and "a broken neck which required surgery." *Id.* ¶¶ 7–9. Ziegler has "also undergone two major back surgeries and two major right knee surgeries including a total knee replacement," and still takes "pain medications daily" for "pain in [his] left arm with diminished use and feeling, and also intermittent pain in both legs with some diminished use and feeling." *Id.* ¶¶ 9–10. "The psychological after-effects were even more devastating," as he recalls his suitemate "dying in [his] arms," and "the sight of [his other] suite mates lying dead in the living room." *Id.* ¶ 11. Ziegler "still ha[s] nightmares," is "hypervigilant

and ha[s] had anger issues." *Id.* ¶ 11. After being "diagnosed as having suffered Traumatic Brain Injury" and with PTSD, he is "rated as 100 percent disabled by the VA." *Id.* ¶ 12; *see id.* Ex. A, Letter from VA to Eric Ziegler re VA Benefits (Mar. 25, 2016), ECF No. 26-2 at 5.

Plaintiff Nancy Kilfoyle was married to Eric Ziegler at the time of the Khobar Towers attack and learned of the attack from several messages on her answering machine, including one "from the Air Force letting [her] know that there had been a bombing [] but that they did not have any information yet about Eric." Pls.' Damages Mot., Attach 2, Decl. of Nancy Kilfoyle ("Kilfoyle Decl.") (June 27, 2018) ¶¶ 3–4, ECF No. 25-2 at 90. She "was frightened and anxious about what might have happened to" him until receiving a call from Ziegler later that day saying that he was injured and "being taken care of in a hospital." *Id.* ¶ 4. Kilfoyle noticed that after Ziegler returned, he "became a different person" and "was now moody and withdrawn." *Id.* ¶ 5. "One time [she] asked him why he no longer seemed to have any close friends, and he said, 'because they die.'" *Id.* She also noted that "[h]is temper was shorter and much more unpredictable," causing her to feel she "had to walk on eggshells to avoid any explosive outbursts," and despite seeking "help from a marriage counselor, [they] grew apart," ultimately divorcing in 2007. *Id.* ¶¶ 6–7. Kilfoyle is "certain that the changes in Eric and the after-effects of the bombing at the Khobar Towers were the principal reason we couldn't work things out." *Id.* ¶ 7. Due to those after-effects, she experienced "many years" of "continuing emotional distress and anguish." *Id.* ¶ 9.

### 13. *Thomas R. Lawrence and Four Family Members*

On June 25, 1996, plaintiff Thomas R. Lawrence was an Air Force avionics specialist on a tour of duty at Dhahran Air Force Base, where he was housed in Khobar Towers. Pls.' Damages Mot., Attach 2, Decl. of Thomas R. Lawrence ("Thomas Lawrence Decl.") (June 27,

2018) ¶ 3, ECF No. 25-2 at 98. He was asleep at the time of the bombing, and "was thrown out of bed and shaken up" by the blast, but does not detail any physical injury. *Id.* ¶¶ 4–5. After making his way downstairs amid "chaos and confusion," Lawrence "was taken to a triage area . . . where [he] saw many very badly wounded Airmen, some on stretchers." *Id.* ¶¶ 5–6. He remained at Dhahran "for almost three more months"—which were "excruciating" due to "fear of a repeat attack"—and during that time he "helped the FBI" investigators "sift through rubble and collect blood-stained articles of clothing, pictures, clocks, and personal effects," and "search areas with blood splattered on the walls and floors." *Id.* ¶ 7. After returning to the United States, Lawrence's "life was never the same," and he "still ha[s] flashbacks and [] difficulty with things that bring back those memories," including giving a presentation on the Khobar Towers attack to classmates at the Airman Leadership School, when he "was overcome by emotion and had to leave the room." *Id.* ¶¶ 9–10. Though he has "tried to stuff everything down related to [his] experience" at Khobar Towers, he is still "often on edge" and "occasionally ha[s] nightmares and flashbacks," as well as "anxiety" and being "quick to anger." *Id.* ¶ 11. In 2008, Lawrence "sought and received psychological support" and was "diagnosed with a form of PTSD called 'Adjustment Disorder with Anxiety.'" *Id.* ¶ 11; *see id.* Ex. A, Clinical Psychologist Progress Notes for Thomas Russell Lawrence (July 28, 2008), ECF No. 25-2 at 103. Nonetheless, he "know[s] that [he is] not nearly the same person [he] was before the attack," and is "more difficult to get along with for [his] wife and family." *Id.* ¶ 12.

Four of Lawrence's family members are plaintiffs in this lawsuit: his wife, Robyn Elizabeth Lawrence, parents, and sister. Lawrence's wife learned of the Khobar Towers attack when she "came home from attending court [and] had 16 messages on [her] voice mail," the first of which "asked if [she] knew whether Thomas was dead or alive." Pls.' Damages Mot., Attach

2, Decl. of Robyn Elizabeth Lawrence ("Robyn Lawrence Decl.") (June 27, 2018) ¶¶ 3–4, ECF No. 25-2 at 104. Although "the second message was from [her] husband and he said that he was basically ok," she was "[n]onethless . . . very upset, in part because [she] didn't know whether he may have been trying to minimize his injuries," and she "cried, . . . hyperventilated, and [] asked a friend to sleep over with" her. *Id.* ¶ 4. Robyn Lawrence became "even more upset when [she] saw some of the news coverage of what had happened at the Khobar towers" and "imagined what Thomas must have gone through," while "fear[ing] that . . . another attack" might occur. *Id.* ¶ 5. She returned to work after several days, but asked her "boss to make sure the cable news was not on while [she] was working . . . because it caused [her] continued distress." *Id.* ¶ 6. Robyn Lawrence states that she "was especially fearful because [she] had already lost both [her] parents when [she] was just seven years old," and "feared that [she] might now lose Thomas as well." *Id.* Though Lawrence had been "optimistic and enjoyed joking around," when he returned he "seemed distant and moody at times. He was irritable and his temper was much shorter." *Id.* ¶ 7. The two were not "able to discuss anything related to" the attack for "many years," and Robyn Lawrence "[e]ventually [] convinced Thomas to seek professional help" for his PTSD. *Id.* ¶ 7. She "believe[s] that [she] also ha[s] some degree of PTSD," and that having lost her parents "at seven made [her] more susceptible to it." *Id.* ¶ 8.

Kimi Lawrence is Lawrence's mother, and learned of the Khobar Towers attack from a radio news bulletin "that there had been a truck bomb explosion at the Khobar Towers," and immediately "felt like [her] world had fallen out from under" her. Pls.' Damages Mot., Attach 2, Decl. of Kimi Lawrence ("Kimi Lawrence Decl.") (June 28, 2018) ¶¶ 3–4, ECF No. 25-2 at 107. She "began to cry" and "became even more worried and distraught" after seeing "some of the images of destruction and rubble on tv," and it was "several [] hours" until she learned from

Robyn Lawrence that her son had survived. *Id.* ¶¶4–5. Kimi Lawrence experienced nausea and "felt terrible anxiety" as Lawrence remained in Dhahran for several months and she "knew he was still in the danger zone, and it was a long time before [she] could see him again and hug him and count his fingers and toes." *Id.* ¶ 7. Though she "knew that Tom would not be the same person" after the bombing, she "was surprised how much he changed when he came back," both "in his face and his behavior." *Id.* ¶ 8. The "change in Tom" caused Kimi Lawrence to feel "helpless and depressed. [They] had always been very close—[she] was eighteen when Tom was born, and in a sense [they] had grown up together," and so it "was difficult for [her] to see the change in" him. *Id.* ¶¶ 9–10. The "experience [her] son went through deeply and adversely affected all of . . . his immediate family, and some of the after-effects of that terrible day still linger with all of" them. *Id.* ¶ 11.

Bruce Russell Lawrence is Thomas's father, and learned of the Khobar Towers attack in a phone call from Kimi Lawrence. Pls.' Damages Mot., Attach 2, Decl. of Bruce Russell Lawrence ("Bruce Lawrence Decl.") (June 28, 2018) ¶¶ 2, 4, ECF No. 25-2 at 110. "Although [he] was about 750 miles away, [he] drove back home all the way that day and night because [he] wanted to be back with [his] wife and daughter as soon as possible," and "realized that [he] had to be strong for [his] wife and daughter." *Id.* ¶¶ 4–5. Bruce Lawrence remained "worried and fearful" while his son "stay[ed] in the danger zone for several more months," and was then "dismayed when [he] saw the changes in Tom when he returned." *Id.* ¶¶ 6–7. Lawrence "was more withdrawn and cautious," and Bruce Lawrence saw "him hit the dirt and dive under a trailer when there [were] fireworks nearby." *Id.* ¶ 7. His "whole family was affected and had to adjust to the new reality of how Tom had changed," and Bruce Lawrence "was always angry

about what happened and about how ineffective the investigation and pursuit of the terrorists seemed to be." *Id.*

Andrea Jo Grimson is Lawrence's sister, and was eleven years old at the time of the Khobar Towers attack. Pls.' Damages Mot., Attach 2, Decl. of Andrea Jo Grimson ("Grimson Decl.") (June 27, 2018) ¶¶ 2–3, ECF No. 25-2 at 112. When her parents told her about the bombing, she "was shocked," and, after seeing coverage of the attack on TV, she "became scared [she] may never see [Lawrence] again because [she] thought there may be another attack like that." *Id.* ¶ 4. Grimson "was very close to [her] brother," and "missed him terribly when he left to join the Air Force," "sometimes [going] to his room and cr[ying] because he was not there." *Id.* Her brother's experience affected her in other ways as well. She was at school during the September 11, 2001, attacks on the World Trade Center, and became "angry with [her] classmates and yelled at them for not taking it seriously enough," believing "they did not understand the severity of such attacks the way [she] did," and Grimson "had to leave school early that day." *Id.* ¶ 6. That reaction underscored the effect of Lawrence's experience, and she was "diagnosed with anxiety and depression issues and ha[s] been on medication since [she] was 16," while also having "to help out with [her] mom who became very depressed and anxious." *Id.* ¶¶ 7–8. Grimson also found that Lawrence "clearly was not the same after he returned," as he "became overly cautious and overly protective, especially with" her, and she "missed and mourned the optimistic and active young man who had been [her] brother." *Id.* ¶ 7. Lawrence's "experience at the Khobar Towers adversely affected all of . . . his immediate family, and some of the after-effects of that terrible day still linger." *Id.* ¶ 9.

### 14.     *Tracy Matthew Winter and One Family Member*

On June 25, 1996, plaintiff Tracy Matthew Winter was a maintenance crew chief in the 58th Fighter Squadron on a tour of duty at Dhahran Air Force Base, where he was housed in Khobar Towers. Pls.' Damages Mot., Attach 2, Decl. of Tracy Matthew Winter ("Winter Decl.") (June 22, 2018) ¶ 3, ECF No. 25-2 at 114. He was "exiting the kitchen area of [the] building . . . when [he] was thrown on the floor by [the] blast," and was struck by "many pieces of flying glass," which caused bleeding requiring "eleven stitches" along with "additional treatment" when he returned to the United States. *Id.* ¶¶ 4–6. Winter subsequently left the Air Force "but had a hard time holding a job," and was ultimately "imprisoned for two years for trafficking in drugs. In prison [he] spoke with a psychiatrist who helped [him] realize for the first time that [he] was having trouble processing what had happened to [him] in the attack." *Id.* ¶ 6. He has been "diagnosed with PTSD and tinnitus and [is] rated as 70 percent disabled." *Id.* ¶ 8; *see id.* Ex. A, VA Rating Decision (Apr. 20, 2012), ECF No. 25-2 at 117–18. Winter's "life has stabilized considerably" since his incarceration, but he "still ha[s] recurring nightmares that wake up [his] wife because [he] cr[ies] out in [his] sleep," including nightmares where he "tr[ies] to scream but no sound comes out, or tr[ies] to shoot a gun but the bullets just roll out." *Id.* ¶ 7.

Plaintiff Angela Rose is Winter's mother, and learned of the Khobar Towers attack from her car radio. Pls.' Damages Mot., Attach 2, Decl. of Angela Rose ("Rose Decl.") (June 28, 2018) ¶¶ 3–4, ECF No. 25-2 at 119. Her "heart was racing and [she] turned around and headed home" where she "turned on the tv news and saw the horrific images of what had happened" and "was extremely distressed and distraught, not knowing if [her] son was alive or dead" until "[m]any hours later." *Id.* ¶¶ 4–5. When Winter returned to the United States, "he was changed," and the "sparkle in his eyes was gone. He slept on the floor with a gun next to him." *Id.* ¶ 6.

Rose "was close to [her] son and loved him very much," and she "suffered severe emotional distress when [she] heard of the attack and saw pictures" in news reports, and "know[s] it hurt him deeply." *Id.* ¶¶ 8–9. In addition to Winter's "continuing psychological issues," their "whole family has been adversely affected to this day" by the bombing. *Id.* ¶ 10.

### 15. *Alan Jeffrey Wade and Three Family Members*

On June 25, 1996, plaintiff Alan Jeffrey Wade was a Senior Airman, Power Production Specialist, on a tour of duty at Dhahran Air Force Base, where he was housed in Khobar Towers. Pls.' Notice of Filing Supporting Decl., Attach 1, Decl. of Alan Jeffrey Wade ("Wade Decl.") (July 5, 2018) ¶ 3, ECF No. 27-1 at 1. When the attack hit, he "was thrown against a concrete wall" and "suffered severe injuries to [his] back, arms, and right hand." *Id.* ¶ 4. The back injury "required major lumbar disc surgery," and Wade still has "considerable pain in [his] lower back and in [his] right hand," but he "also suffered severe emotional distress" as what he "experienced and saw on that day has never left" him. *Id.* ¶¶ 4–6. He "saw many close friends and co-workers lying in the rubble and did what [he] could to help bring them to safety," for which efforts he was awarded The Air Force Commendation Medal, in addition to a Purple Heart for his own injuries. *Id.* ¶ 5.[9] Wade "suffered considerable pain and significant after-effects, both physical and psychological, as a result of being a victim of the terrorist attack that day," and has "received treatment for [PTSD], Major Depressive Disorder, suicide attempts, and survivors' guilt

---

[9]     The Air Force Commendation Medal citation states:
        Airman Wade was present during the terrorist attack on Khobar Towers . . . . Within seconds following the blast, Airman Wade started to search for wounded and other survivors . . . . With total disregard for his personal safety, he helped comb the entire building in an attempt to account for all of the building's 130 occupants. Demonstrating outstanding calm and sense of purpose, he . . . ensure[d] that wounds were treated promptly. He served on a team fabricating stretchers from broken doors and ensured that casualties were safely evacuated from the building. He helped transport wounded to the casualty collection point for additional treatment. His conduct during the evening of 25 June 1996 directly saved the lives of at least six persons.
Wade Decl., Ex. A, Air Force Commendation Medal Awarded to Senior Airman Alan J. Wade (Dec. 2, 1996), ECF No. 27-1 at 4–5.

syndrome, but [that] list just touches the surface." *Id.* ¶¶ 7–8. He has also "been unable to hold steady employment" and has "difficulty maintaining relationships with [his] family," who "were all very close to" him and who he knows are "deeply concerned about" him. *Id.* ¶¶ 7, 9.

Three of Wade's family members are plaintiffs in this lawsuit: his parents, and his brother. Bonnie C. Wade is Wade's mother, and "learned of the bomb attack on the television national news," which she and her husband watched "with increasing horror and fear as reports came in of the building collapse and destruction of the living quarters." Pls.' Damages Mot., Attach 2, Decl. of Bonnie C. Wade ("Bonnie Wade Decl.") (June 23, 2018) ¶¶ 3–4, ECF No. 25-2 at 121. The phone number for an information line "was so overloaded [she] could not get through," and Bonnie Wade waited "about seven hours" before learning that Wade had survived, during which time her "anxiety about [her] son grew severe," her "heart was racing and skipping beats," her "[b]reathing was rapid and labored," and she "felt like all energy had drained out of" her. *Id.* ¶¶ 4–6. After Wade returned, however, she immediately "noticed some significant changes" to the "carefree and happy young man" who had left for Saudi Arabia: he "isolated himself from family members; he had anger management problems; [and] he had a hard time maintaining any employment." *Id.* ¶ 7. Bonnie Wade "worried about him a lot," even "driv[ing] to his house to check on him" if she had been unable to "contact him for a long time." *Id.* In one instance, she and her husband "used [their] key to enter because [her son] didn't respond to the doorbell, and he became very angry and threatened" them. *Id.* Although Wade has received treatment, Bonnie Wade "would like to think that he is being helped but [she is] not sure," and—given that "there is no complete cure for PTSD," and that she is "not sure [her son] takes" his prescribed medications—she "worr[ies] about Alan every day," to the extent that she "ha[s] trouble sleeping because [she] reprocess[es] all [her] worries and concerns about Alan." *Id.* ¶¶

8–9.  She is also concerned "about what will happen to Alan after" she and her husband, who "are in [their] late seventies," "are no longer able to assist him."  *Id.* ¶ 10.  Bonnie Wade states that the Khobar Towers attack "has deeply and adversely affected" Wade as well as "the lives of all those who love him, including" her.  *Id.* ¶ 11.

Thomas H. Wade is Wade's father, and "learned of the attack on the television news," when he and his wife "saw the pictures of the devastation and the rubble that was left of one of the Khobar Towers buildings."  Pls.' Damages Mot., Attach 2, Decl. of Thomas H. Wade ("Thomas Wade Decl.") (June 23, 2018) ¶¶ 2, 4, ECF No. 25-2 at 126.  He "was very worried" and "feared that [his] son was critically injured or worse, but [he] tried to keep hope alive because [his] wife was in a panic state."  *Id.* ¶ 4.  After being unable to get through to the Air Force's hotline number, Thomas Wade "finally heard from Alan" about seven hours after first learning about the bombing.  *Id.* ¶ 5.  "After Alan returned to the United States he was awarded a Purple Heart" but "refused to attend the presentation ceremony."  *Id.* ¶ 6.  It "became obvious that he had emotional issues," and that "the carefree, optimistic young man who had left for Saudi Arabia was no longer the same."  *Id.* ¶¶ 6–7.  "He withdrew from his family and isolated himself.  Alan was a talented and smart person," but "the after-effects of his experience in Saudi Arabia were undermining him and eating away at his ability to keep employment or maintain relationships, even with his family who loved and tried to help him."  *Id.* ¶ 7.  Wade's "condition has deteriorated" in the last year, and he "has required further hospitalization and psychiatric care," and Thomas and Bonnie Wade "worry about [their] son" and "continue to try to help him in any way [they] can."  *Id.* ¶¶ 8–9.

Michael Kevin Wade is Wade's brother, and the two "were close growing up and stayed in close touch even after [Wade] enlisted in the Air Force."  Pls.' Damages Mot., Attach 2, Decl.

of Michael Kevin Wade ("Michael Wade Decl.") (June 23, 2018) ¶ 3, ECF No. 25-2 at 124.

Michael Wade learned of the Khobar Towers attack when, returning home from work, he "turned on the tv and saw the destruction and rubble," and he "was very anxious and terrified that [his] brother may have been killed in the blast." *Id.* ¶ 5. He could not get through to the Air Force information hotline, and so "checked frequently with [his] parents" until finally at "2 am [he] heard from" his father that his brother was alive. *Id.* ¶ 6. Despite his "relie[f]," he "still got almost no sleep that night." *Id.* After Wade's return, Michael Wade saw "the devastating impact the terrorist attack had on his life," as Wade "frequently lost his temper, and had trouble holding any jobs." *Id.* ¶ 7. The effect grew "worse" over time, and Wade "frequently sent . . . bizarre and delusional emails," and was "suspicious of [his family's] motives when [they] tried to help him." *Id.* ¶ 8. Michael Wade is "sad and distressed" that he "may never again be able to experience the warm and close relationship [he] had with Alan." *Id.* ¶ 9.

### 16. *Richard M. Williams*

Plaintiff Richard M. Williams is the father of Kevin S. Williams, who, on June 25, 1996, was an Air Force Accounting Officer on a tour of duty at Dhahran Air Force Base, where he was housed in Khobar Towers. Pls.' Damages Mot., Attach 2, Decl. of Richard M. Williams ("Williams Decl.") (June 27, 2018) ¶ 3, ECF No. 25-2 at 128. When the bomb detonated, Kevin Williams "was sitting in the window well of his room, and was blown across the room and against the wall . . . by the force of the blast," causing "injuries to his head and body" for which he "was awarded a Purple Heart." *Id.* ¶ 4. Williams learned of the attack from Kevin Williams's mother, and was "shocked and dismayed to see pictures of the rubble and devastation" when he "turn[ed] on the television news." *Id.* ¶ 5. He "was extremely anxious, not knowing whether Kevin had survived or suffered serious injury," and did not receive any news "for about 48

hours," during which time he, his wife, and younger son "became nervous wrecks" and Williams "suffered great mental anguish and emotional distress." *Id.* ¶¶ 6–7, 10. Williams "heard from one of Kevin's close friends . . . that he had seen footage on the cable news of Kevin being evacuated on a stretcher" and that "Kevin was moving and was clearly alive," before finally "hear[ing] from Kevin himself . . . that, although he had been wounded, he would be ok." *Id.* ¶ 7. He and his son "have always been very close," and Williams "moved to be near him after he joined the Air Force, and [they] would get together on holidays and often at other times . . . even when he was later stationed at more distant locations," but he "know[s] that [his son] sometimes experiences flashbacks and is saddened when he thinks about what happened at the Khobar Towers." *Id.* ¶ 9. Though he is "very proud" of his son's Air Force career, he "know[s] that Kevin's life and [his] own were never the same after that attack." *Id.* ¶ 10.

### D. PROCEDURAL HISTORY

The plaintiffs filed this lawsuit against the defendants on April 17, 2017. *See* Compl. The defendants were properly served in accordance with the FSIA, which provides the procedure for completing service upon a foreign state or political subdivision of a foreign state. *See* Return of Service, ECF No. 19; *see also infra* Part III.B (detailing service on defendants). The Clerk entered default against the defendants on January 22, 2018. Entry of Default, ECF No. 21. The plaintiffs subsequently filed the instant motions for default judgment as to liability and for damages. *See* Pls.' Liability Mot.; Pls.' Damages Mot. In response to the Court's June 15, 2018, Minute Order, the plaintiffs "elect[ed] to submit documentary evidence to the Court" rather than present evidence at an evidentiary hearing. Pls.' Notice of Election to Submit Documentary Evidence, ECF No. 24.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 55(b)(2), a court may consider entering a default judgment when a party applies for that relief. *See* FED. R. CIV. P. 55(b)(2). "[S]trong policies favor resolution of disputes on their merits," and therefore, "'[t]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party.'" *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)).

Notwithstanding its appropriateness in some circumstances, "entry of a default judgment is not automatic." *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted). Thus, the procedural posture of a default does not relieve a federal court of its "affirmative obligation" to determine whether it has subject-matter jurisdiction over the action. *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996). Additionally, "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant," but "[i]n the absence of an evidentiary hearing, although the plaintiffs retain 'the burden of proving personal jurisdiction, they can satisfy that burden with a *prima facie* showing.'" *Mwani*, 417 F.3d at 6–7 (quoting *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991)) (alteration adopted). In doing so, "they may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *Id.* at 7.

Finally, when default judgment is sought under the FSIA, a claimant must "establish[] his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). "This provides foreign sovereigns a special protection akin to that assured the federal government by FED. R. CIV. P. 55(e)," which has been renumbered by the 2007 amendment to Rule 55(d). *Jerez*

*v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014); *see also* H.R. REP. No. 94-1487, at 26 (1976) (stating that § 1608(e) establishes "the same requirement applicable to default judgments against the U.S. Government under rule 55(e), F.R. Civ. P.").  While the "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be 'satisfactory to the court,'" courts must be mindful that Congress enacted Section 1605A, FSIA's terrorism exception, and Section 1608(e) with the "aim[] to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047–48 (D.C. Cir. 2014) (quoting 28 U.S.C. § 1608(e)).

With this objective in mind, the D.C. Circuit has instructed that "courts have the authority—indeed, we think, the obligation—to 'adjust evidentiary requirements to . . . differing situations.'" *Id.* at 1048 (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)) (alteration adopted).  Courts must draw their "findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence." *Id.* at 1049 (quoting *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 21 n.1 (D.D.C. 2001)).  "In a FSIA default proceeding, a factual finding is not deemed clearly erroneous if 'there is an adequate basis in the record for inferring that the district court . . . was satisfied with the evidence submitted.'" *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (quoting *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994)) (alteration in original).  Uncontroverted factual allegations that are supported by admissible evidence are taken as true. *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) ("Courts may rely on uncontroverted factual allegations that are supported by affidavits." (citing *Rimkus*, 750 F. Supp. 2d at 171)); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 63 (D.D.C. 2008), *aff'd*, 646 F.3d 1 (D.C.

Cir. 2011) (quoting *Estate of Botvin v. Islamic Republic of Iran*, 510 F. Supp. 2d 101, 103 (D.D.C. 2007)); *accord* Fed. R. Civ. P. 56(e)(2) (authorizing court to "consider the fact undisputed for purposes of the motion" when adverse party "fails to properly address another party's assertion of fact").

Finally, the D.C. Circuit "review[s] the District Court's FSIA damages awards for abuse of discretion," and its "review of findings underlying a default judgment in a FSIA case of this sort is 'lenient.'" *Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affairs, et al.*, 892 F.3d 348, 356 (D.C. Cir. 2018) (quoting *Owens*, 864 F.3d at 785).

### III. DISCUSSION

A default judgment may be entered when (1) the Court has subject-matter jurisdiction over the claims, (2) personal jurisdiction is properly exercised over the defendants, (3) the plaintiffs have presented satisfactory evidence to establish their claims against the defendants, and (4) the plaintiffs have satisfactorily proven that they are entitled to the monetary damages they seek. Each of these requirements is addressed *seriatim* below.

### A. SUBJECT-MATTER JURISDICTION UNDER THE FSIA

This Court may exercise "original jurisdiction" over a foreign state "without regard to amount in controversy" in "nonjury civil action[s]" seeking "relief *in personam* with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement." 28 U.S.C. § 1330(a). As the plaintiffs seek *in personam* relief, the remaining question is whether the defendants are entitled to immunity under the FSIA or another international agreement.

Foreign governments are generally immunized from lawsuits brought against them in the United States unless an FSIA exception applies. *See* 28 U.S.C. § 1604; *Mohammadi v. Islamic*

*Republic of Iran*, 782 F.3d 9, 13–14 (D.C. Cir. 2015). The plaintiffs invoke jurisdiction under § 1605A of the FSIA, which provides that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act . . . ." 28 U.S.C. § 1605A(a)(1). The plaintiffs must prove four elements to establish subject-matter jurisdiction under this exception: (1) "the foreign country was designated a 'state sponsor of terrorism at the time of the act,'" *Mohammadi*, 782 F.3d at 14 (quoting 28 U.S.C. § 1605A(a)(2)(A)(i)(I)); (2) "the 'claimant or the victim was' a 'national of the United States' at that time," *id.* (quoting 28 U.S.C. § 1605A(a)(2)(A)(ii)); (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim," 28 U.S.C. § 1605A(a)(2)(A)(iii); and (4) the plaintiff seeks monetary damages "for personal injury or death caused by 'torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act,' if 'engaged in by an official, employee, or agent' of a foreign country," *Mohammadi*, 782 F.3d at 14 (quoting 28 U.S.C. § 1605A(a)(1)). The plaintiffs have satisfactorily proven the applicable elements here.[10]

With respect to the first element, Iran has been designated a state sponsor of terrorism by the U.S. Department of State since 1984, and, consequently, retained this designation at the time of the Khobar Towers bombing. *See* Compl. ¶ 20; *see also Anderson*, 753 F. Supp. 2d at 76 ("Iran . . . has been designated a state sponsor of terrorism . . . since January 19, 1984." (internal

---

[10] Although this suit falls beyond the ten-year statute of limitations for actions brought under the FSIA's terrorism exception established at 28 U.S.C. § 1605A(b), the "limitation period in § 1605A(b) is not jurisdictional," and the defendants have "forfeited [their] affirmative defense . . . by failing to raise it in" this Court. *Owens*, 864 F.3d at 804.

quotation marks omitted)). The IRGC, as "a military organization and a branch of the Islamic Republic of Iran," Compl. ¶ 22, is included within the FSIA's definition of a "foreign state" as encompassing "a political subdivision of a foreign state or an agency or instrumentality" thereof, 28 U.S.C. § 1603(a); *see Rimkus*, 750 F. Supp. 2d at 180 (finding that the IRGC "constitute[s] [an] integral part[] of Iran's political structure, and thus constitute[s] a foreign state for [FSIA] purposes"). Consequently, the plaintiffs have satisfied the first element as to both defendants.

As to the second element, the plaintiffs have averred in sworn declarations that they were United States citizens at the time of the attack. *See* Akins Decl. ¶ 2 (attesting to the declarant's United States citizenship); Anthony Decl. ¶ 2 (same); Sills Decl. ¶ 2 (same); Hurst Decl. ¶ 2 (same); MacKenzie Decl. ¶ 2 (same); Remar Decl. ¶ 2 (same); Charles Blank Decl. ¶ 2 (same); Linda Blank Decl. ¶ 2 (same); Nathan Blank Decl. ¶ 2 (same); Millrany Decl. ¶ 2 (same); Andrew Blank Decl. ¶ 2 (same); John Gaydos Decl. ¶ 2 (same); Barbara Gaydos Decl. ¶ 2 (same); Ethan Gaydos Decl. ¶ 2 (same); Elizabeth Gaydos Decl. ¶ 2 (same); Matthew Spicer Decl. ¶ 2 (same); Cathy Spicer-Lindsy Decl. ¶ 2 (same); Spicer-Lindsy for Christian Spicer Decl. ¶ 2 (same); Christopher Spicer Decl. ¶ 2 (same); Jerry Sasser Jr. Decl. ¶ 2 (same); Jerry Sasser Sr. Decl. ¶ 2 (same); Homs Decl. ¶ 2 (same); Pls.' Liability Mot, Ex. A, Decl. of Jason Allen Sasser (Dec. 21, 2017) ¶ 2, ECF No. 22-2 at 31 (same); Leinenbach Decl. ¶ 2 (same); Joy Leinenbach Decl. ¶ 2 (same); Ziegler Decl. ¶ 2 (same); Kilfoyle Decl. ¶ 2 (same); Thomas Lawrence Decl. ¶ 2 (same); Robyn Lawrence Decl. ¶ 2 (same); Kimi Lawrence Decl. ¶ 2 (same); Bruce Lawrence Decl. ¶ 2 (same); Grimson Decl. ¶ 2 (same); Winter Decl. ¶ 2 (same); Rose Decl. ¶ 2 (same); Wade Decl. ¶ 2 (same); Bonnie Wade Decl. ¶ 2 (same); Thomas Wade Decl. ¶ 2 (same); Michael Wade Decl. ¶ 2 (same); Williams Decl. ¶ 2 (same). Thus, the second element is firmly established.

The plaintiffs in this case need not satisfy the third element because the attack took place in Saudi Arabia, not Iran, and thus the statutory requirement of "afford[ing] the foreign state a reasonable opportunity to arbitrate the claim" before bringing this action does not apply. 28 U.S.C. § 1605A(a)(2)(A)(iii).

Finally, the evidence presented in *Blais* and *Heiser*, of which the Court has taken judicial notice, is sufficient to establish that the plaintiffs' claimed damages "for personal injury . . . that was caused by an . . . extrajudicial killing" at the Khobar Towers for which the defendants provided "material support or resources." 28 U.S.C. § 1605A(a)(1). The plaintiffs explain the history of Iran and IRGC's support of Hezbollah, Compl. ¶¶ 24–27, and the expert testimony in the *Blais* and *Heiser* litigation, described above, based on the FBI's extensive investigation of the bombing, proves that the defendants "organized and sponsored" the Khobar Towers attack, *Heiser I*, 466 F. Supp. 2d at 262. In other words, the evidence shows that the defendants' actions were a "substantial factor in the sequence of events that led to the plaintiff[s'] injur[ies]," and that those injuries were "reasonably foreseeable or anticipated as a natural consequence of the defendant[s'] conduct." *Owens*, 864 F.3d at 794 (internal quotation marks omitted).

In addition, the Khobar Towers bombing carried out by Saudi Hezbollah, which killed 19 American service members and caused the "personal injur[ies]" suffered by the plaintiffs, was manifestly an extrajudicial killing for which the defendants provided material support, and for which the defendants can be subject to the jurisdiction of this Court. *See Owens*, 864 F.3d at 778 ("[T]he plain meaning of § 1605A(a) grants . . . jurisdiction over claims against designated state sponsors of terrorism that materially support extrajudicial killings committed by nonstate actors."). "[E]xtrajudicial killing" has the "meaning given . . . in section 3 of the Torture Victim Protection Act of 1991," 28 U.S.C. § 1605A(h)(7), which, in turn, defines this term to mean "a

deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples," Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992) (codified at 28 U.S.C. § 1350 note § 3(a)). No "regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples" could have authorized the truck bomb that "sheared off the face of Building 131 . . . and reduced most of it to rubble." *Blais*, 459 F. Supp. 2d at 48. Thus, the evidence presented in *Blais* and *Heiser* demonstrates that the plaintiffs' claims arise from an extrajudicial killing for which the defendants provided material support.

Accordingly, the defendants do not enjoy foreign sovereign immunity from the instant suit, pursuant to 28 U.S.C. § 1605A, and subject-matter jurisdiction may be properly exercised pursuant to 28 U.S.C. § 1330(a).

## B. PERSONAL JURISDICTION

The Court next examines whether effective service has been made, as required by 28 U.S.C. § 1330(b), which governs personal jurisdiction over foreign states. *See* 28 U.S.C. § 1330(b) (providing that "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of this title"). Service may be effected under 28 U.S.C. § 1608 in one of four ways: (1) by "special arrangement for service between the plaintiff and the foreign state," (2) "in accordance with an applicable international convention on service of judicial documents," or, if the first two options are not applicable, (3) by "sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned," or, if

service cannot be made under the third option, (4) by requesting the Clerk of the Court to send the aforementioned package to "the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted." 28 U.S.C. § 1608(a).

"The defendants have neither made a special arrangement for service with the plaintiffs nor entered into any international convention governing service," *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78 (D.D.C. 2017); Pls.' Liability Mem. at 4–5, leaving only the latter two forms of service available here. The plaintiffs used both. The necessary papers were sent by certified mail to Iran, via its ministry of foreign affairs, Certificate of Mailing (May 11, 2017), ECF No. 12, and to the IRGC, Certificate of Mailing (May 26, 2017), ECF No. 14, consistent with 28 U.S.C. § 1608(a)(3). The necessary papers were also transmitted via diplomatic channels, Return Serv./Aff., ECF No. 19, consistent with 28 U.S.C. § 1608(a)(4).

Accordingly, the plaintiffs have established that service was properly effected against the defendants and, thus, personal jurisdiction is properly exercised.

### C.   THE DEFENDANTS' LIABILITY

All the plaintiffs bring a claim under 28 U.S.C. § 1605A(c) for intentional infliction of emotional distress. Compl. ¶¶ 43–48 (Count III). In addition, the fifteen service member plaintiffs who were present at the bombing site bring a claim for assault and battery, *id.* ¶¶ 36–42 (Count II), seeking compensatory damages for "personal injury, mental anguish, pain and suffering, loss of companionship and society, loss of consortium, pecuniary loss[,] . . . loss of income," *id.* ¶ 33, the twenty-four family member plaintiffs bring a claim for loss of solatium, *id.*

¶¶ 50–51 (Count IV), and all thirty-nine plaintiffs seek "punitive damages" as well, *id.* ¶ 56 (Count V). Section 1605A(c) provides a federal private right of action against designated state sponsors of terrorism for enumerated categories of persons, including "a national of the United States" or her "legal representative," for "personal injury or death caused by . . . that foreign state . . . for which the courts of the United States may maintain jurisdiction . . . for money damages." 28 U.S.C. § 1605A(c). Successful plaintiffs may recover damages that "include economic damages, solatium, pain and suffering, and punitive damages." *Id*.

Section 1605A(c) provides a private right of action, but no guidance on the substantive bases for liability to determine plaintiffs' entitlement to damages. Consequently, courts "may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)." *Fraenkel*, 892 F.3d at 353; *see Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 24 (D.D.C. 2009) ("*Heiser II*") (applying "general principles of tort law," such as the Restatement (Second) of Torts, to determine liability); *see also Roth*, 78 F. Supp. 3d at 399 (citing *Oveissi*, 879 F. Supp. 2d at 54); *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 335 (D.D.C. 2014). The availability of these claims for each plaintiff is discussed in detail below.

### 1. *Service Member Victims*

The fifteen plaintiffs who were members of the U.S. Armed Forces injured in the Khobar Towers bombing—Todd Akins, George C. Anthony, Charles Blank, John Gaydos, Kevin James Hurst, Thomas R. Lawrence, Gregory Eric Leinenbach, Nicholas L. MacKenzie, Jason Porter Remar, Jerry Timothy Sasser, Frank David Sills III, Matthew G. Spicer, Alan Jeffrey Wade, Tracy Matthew Winter, and Eric Dale Ziegler—were each United States citizens at the time of

the attack and, therefore, are expressly covered by, and entitled to bring claims under, Section 1605A(c).

### a. Assault and Battery

The defendants are liable for assault on each of the fifteen service members present at Khobar Towers on June 25, 1996, if, when the defendants provided material support and resources for the attack, they acted "intending to cause a harmful or offensive contact with . . . or an imminent apprehension of such a contact" with those attacked, and those attacked were "thereby put in such imminent apprehension." RESTATEMENT (SECOND) OF TORTS § 21(1) (AM. LAW INST. 1977). The attack and other similar acts are intended to cause harm or, at least, fear of such harm among those targeted. Indeed, "terrorism" is defined to mean "the use of violent acts to frighten the people in an area as a way of trying to achieve a political goal." Terrorism, Merriam-Webster Dictionary Online, http://www.merriam-webster.com/dictionary/terrorism (last visited Sept. 9, 2018). The defendants are liable for battery if, when they provided material support and resources for the attack, they acted "intending to cause a harmful or offensive contact . . . or an imminent apprehension of such a contact" with those attacked, and "a harmful contact with [those attacked] directly or indirectly results." RESTATEMENT (SECOND) OF TORTS § 13. "Harmful contact" has occurred where "any physical impairment of the condition of another's body, or physical pain or illness" results. *Id.* § 15.

Each of the fifteen plaintiffs injured in the Khobar Towers bombing has, through their sworn declarations, demonstrated the physical and psychological impact of the bombing. *See* Akins Decl. ¶¶ 4–9; Anthony Decl. ¶¶ 4–11; Sills Decl. ¶¶ 4–12; Hurst Decl. ¶¶ 4–8; MacKenzie Decl. ¶¶ 4–10; Remar Decl. ¶¶ 4–8; Charles Blank Decl. ¶¶ 4–18; John Gaydos Decl. ¶¶ 6–17; Matthew Spicer Decl. ¶¶ 5–9; Jerry Sasser Decl. ¶¶ 5–15; Leinenbach Decl. ¶¶ 6–16; Ziegler

Decl. ¶¶ 4–13; Thomas Lawrence Decl. ¶¶ 4–11; Winter Decl. ¶¶ 4–8; Wade Decl. ¶¶ 4–8.

Accordingly, the defendants are liable for assault and battery to these fifteen plaintiffs.[11]

### b.        Intentional Infliction of Emotional Distress

The defendants are liable for intentional infliction of emotional distress if they, "by extreme and outrageous conduct[,] intentionally or recklessly cause[d] severe emotional distress to" the plaintiffs.  RESTATEMENT (SECOND) OF TORTS § 46(1); *see also Roth*, 78 F. Supp. 3d at 400 (quoting *Heiser II*, 659 F. Supp. 2d at 26).  Where the claimants were not the direct recipient of the "extreme and outrageous conduct," the Restatement permits recovery if (1) they are members of a victim's immediate family and (2) they are present at the time, or "the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present."  *Heiser II*, 659 F. Supp. 2d at 26–27 (quoting DAN B. DOBBS, The LAW OF TORTS § 307, at 834 (2000)); *see also* RESTATEMENT (SECOND) OF TORTS § 46, cmt. l (leaving "open the possibility of situations in which presence at the time may not be required").

The defendants engaged in conduct that is extreme and outrageous by providing material support and resources to a known terrorist organization.  *See, e.g.*, *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 77 (D.D.C. 2010) ("Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." (quoting *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009))).  The fifteen plaintiff service members present at Khobar Towers suffered the repercussions of the extreme and outrageous conduct.  The service members' declarations demonstrate that the Khobar Towers attack caused extreme emotional distress, and seven of these plaintiffs have been formally

---

[11]        Christopher Galletto was not present at Khobar Towers on June 25, 1996, and his declaration does not describe any fear or "imminent apprehension" as a result of the bombing.  *See* Galletto Decl.  Accordingly, the defendants are not liable to Galletto for assault and battery.

diagnosed with PTSD. *See* Akins Decl. ¶ 6 (noting PTSD diagnosis); Anthony Decl., Ex. A,

Disabilities Rating (noting PTSD diagnosis); Sills Decl. ¶¶ 11–12; Hurst Decl. ¶ 8; MacKenzie

Decl. ¶¶ 9–10; Remar Decl. ¶¶ 8–9; Charles Blank Decl. ¶¶ 17–18; John Gaydos Decl., Ex. A,

Psychological Evaluation of John Gaydos (noting "severe symptoms associated with" PTSD);

Matthew Spicer Decl. ¶¶ 9–10; Jerry Sasser Decl. ¶¶ 9–15; Leinenbach Decl. ¶ 13 (noting PTSD

diagnosis); Ziegler Decl., Ex. A, Letter from VA to Eric Ziegler re VA Benefits (noting PTSD

diagnosis); Thomas Lawrence Decl. ¶ 11 (noting diagnosis of "a form of PTSD called

'Adjustment Disorder with Anxiety'"); Winter Decl. ¶ 8 (noting PTSD diagnosis); Wade Decl.

¶¶ 5–8. Accordingly, the defendants are liable to the fifteen plaintiffs injured at the Khobar

Towers bombing for intentional infliction of emotional distress.[12]

### 2. *Victims' Family Members*

The twenty-four plaintiffs who are immediate family members of service members

injured at the Khobar Towers bombing—Andrew P. Blank, Linda Kay Blank, Nathan Blank,

Barbara Gaydos, Ethan Gaydos, Elizabeth Gaydos, Andrea Jo Grimson, Robyn Elizabeth

---

[12] Christopher Galletto was not present at the Khobar Towers at the time of the attack, and the defendants are therefore not liable to him for intentional infliction of emotional distress. The Khobar Towers bombing was a terrorist bombing, and "the intent to create maximum emotional impact, particularly on third parties, is terrorism's *raison d'etre.*" *Heiser II*, 659 F. Supp. 2d at 27 (internal quotation marks omitted). Galletto clearly felt that impact. *See* Galletto Decl. ¶¶ 6, 9 (averring that he "felt a tremendous sense of grief and loss" after the attack, and has "never come to grips with the loss of three of [his] closest friends on that terrible day"). "As much as we sympathize with [his] claims, we have no authority to stretch the law beyond its *clear bounds* to satisfy our sense of justice." *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 336 (D.C. Cir. 2003) (emphasis in original). *Heiser II* held that "to collect for intentional infliction of emotional distress in cases such as this one, the plaintiff need not be present at the place of outrageous conduct, but must be a member of the victim's immediate family," or, with "a slight stretching of the immediate-family requirement," step-parents of the victim. 659 F. Supp. 2d at 27, 29 (internal quotation marks omitted); *see also Owens*, 864 F.3d at 810 & n.6 (noting that "[s]everal district courts have applied" the immediate family exception to the presence requirement "to claims for emotional distress under the federal cause of action in the new FSIA terrorism exception."). Stretching the immediate family exception to the presence requirement to encompass a member of the same squadron who was absent at the time of the attack and was "good friends" with victims of the attack, Galletto Decl. ¶ 4, is not supported by the Restatement or by Circuit precedent, or by any decisions by other Judges of this Court, *cf., e.g., Roth*, 78 F. Supp. 3d at 400 ("The 'immediate family' requirement is strictly construed in FSIA cases."). Accordingly, the defendants are not liable to Galletto for intentional infliction of emotional distress. Since Galletto may not recover against the defendants on either theory of liability—assault and battery or intentional infliction of emotional distress—his claim must be dismissed.

Lawrence, Bruce Russell Lawrence, Kimi Lawrence, Joy Leinenbach, Deborah Millraney, Jerry

Timothy Sasser, Sr., Jason Allen Sasser, Deborah Homs, Cathy Eunha Kim Spicer Lindsy,

Christian William Spicer, Christopher G. Spicer, Bonnie C. Wade, Michael Kevin Wade,

Thomas H. Wade, Richard M. Williams, Angela Rose, and Nancy Kilfoyle—were each United

States citizens at the time of the attack and, therefore, are expressly covered by, and entitled to

bring claims under, Section 1605A(c).

Each of these twenty-four plaintiffs is an immediate family member of a service member

injured in the Khobar Towers bombing, but none was present at the time of the attack. In this

case, however, the defendants' conduct in materially supporting Saudi Hezbollah was

"sufficiently outrageous and intended to inflict severe emotional harm upon a person who is not

present," such that a victim's family members need not have been present to recover for their

emotional distress. *Heiser II*, 659 F. Supp. 2d at 27 (quoting DAN B. DOBBS, THE LAW OF TORTS

§ 307, at 834); *see also Roth*, 78 F. Supp. 3d at 401; *Worley*, 75 F. Supp. 3d at 336–37; *Wyatt v.

Syrian Arab Republic*, 908 F. Supp. 2d 216, 231 (D.D.C. 2012).[13]  Consequently, the defendants

---

[13]        The D.C. Circuit, in 2017, certified to the D.C. Court of Appeals the question of whether, in an action "arising from a terrorist attack that killed or injured a family member," a foreign national plaintiff asserting a claim under D.C. law for intentional infliction emotional distress must "have been present at the scene of the attack in order to state a claim," *Owens*, 864 F.3d at 812, but this does not preclude recovery on such claim here.  As noted above, the U.S. citizen plaintiffs in this action do not rely on D.C. law, but rather the private right of action established by § 1605A(c), for which courts "may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages." *Fraenkel*, 92 F.3d at 353; *see also Heiser II*, 659 F. Supp. 2d. at 28 (stating that claims for damages under § 1605A(c) are "consider[ed] . . . in light of traditional state-adopted principles of tort law and the construction given them by federal judges in similar cases, rather than—as was the practice under the old pass-through approach—simply the explicit requirements of the relevant state law").  Indeed, the D.C. Circuit acknowledged in *Owens* that § 1605A(c) "provided a uniform source of federal law through which plaintiffs could seek recovery against a foreign sovereign." *Owens*, 864 F.3d at 765; *see also id.* at 809 ("[I]n most cases brought under the new terrorism exception, the plaintiff need not rely upon state tort law . . . . U.S. nationals will continue to sue under § 1605A(c) and benefit from its consistent application.").  Thus, the certified question related to awards under D.C. law to "foreign family member plaintiffs," *id.* at 809, not U.S. citizen plaintiffs.  This distinction is reflected in the D.C. Circuit's 2018 *Fraenkel* decision, which, while affirming that "a claim for solatium [i]s nearly indistinguishable from a claim for intentional infliction of emotional distress," *Fraenkel*, 892 F.3d at 357 (citing *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015)) (internal quotation marks omitted), did not take issue, as a matter of law, with the propriety of awarding solatium damages to family members of the victim of terrorist actions when those family members were not present at the site of the victim's kidnapping and murder, *see id.* at 352.

are liable to these twenty-four plaintiffs—Andrew P. Blank, Linda Kay Blank, Nathan Blank, Barbara Gaydos, Ethan Gaydos, Elizabeth Gaydos, Andrea Jo Grimson, Robyn Elizabeth Lawrence, Bruce Russell Lawrence, Kimi Lawrence, Joy Leinenbach, Deborah Millraney, Jerry Timothy Sasser, Sr., Jason Allen Sasser, Deborah Homs, Cathy Eunha Kim Spicer Lindsy, Christian William Spicer, Christopher G. Spicer, Bonnie C. Wade, Michael Kevin Wade, Thomas H. Wade, Richard M. Williams, Angela Rose, and Nancy Kilfoyle—for intentional infliction of emotional distress caused by their extreme and outrageous conduct in materially supporting the Khobar Towers attack.

Accordingly, the plaintiffs have established the defendants' liability to the plaintiffs under the federal private right of action against state sponsors of terrorism, 28 U.S.C. § 1605A(c), for the torts of assault, battery, and intentional infliction of emotional distress.  The damages allowable to the plaintiffs are discussed next.

### D.    DAMAGES

The plaintiffs in this case seek to recover economic, pain and suffering, solatium, and punitive damages to compensate for their own losses and to punish the defendants for their role in the Khobar Towers bombing.[14]  The damages to which each plaintiff is entitled are described below.

### 1.  *Legal Standard for Damages under Section 1605A(c)*

Congress, in creating a private right of action in Section 1605A(c) for victims of state-sponsored terrorism, also provided, in the same subsection, that such foreign states are liable for

---

[14]    Damages recoverable for the plaintiffs' claims of intentional infliction of emotional distress resulting from harms suffered by their immediate family members will be discussed as claims for solatium damages.  *See, e.g.*, *Fraenkel*, 892 F.3d at 357 (citing *Flanagan*, 87 F. Supp. 3d at 115, for the proposition that "a claim for solatium [i]s nearly indistinguishable from a claim for intentional infliction of emotional distress" (internal quotation marks omitted)); *Valore*, 700 F. Supp. 2d at 85 ("Under the FSIA, a solatium claim is indistinguishable from an [intentional infliction of emotional distress] claim.").

money damages, including "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). "Upon obtaining a default judgment, successful plaintiffs may recover damages by proving 'that the projected consequences are reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate.'" *Fraenkel*, 892 F.3d at 353 (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003)); *see also Roth*, 78 F. Supp. 3d at 402 ("To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate consistent with this [Circuit]'s application of the American rule on damages." (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (internal quotation marks omitted and alteration in original))); *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 289 (D.D.C. 2015) (quoting *Hill*, 328 F.3d at 681). In determining the "reasonable estimate," courts may look to expert testimony and prior awards for comparable injury. *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008).

The evidence presented in *Blais* and *Heiser I*, of which this Court has taken judicial notice and reviewed *supra* in Part I.B, has satisfactorily shown that the plaintiffs' injuries were reasonably certain and were actually the intended consequences of the defendants' material support of Saudi Hezbollah. Consequently, the defendants' conduct in supporting Saudi Hezbollah was likely, and intended, to result in injury and death and to devastate the families of the victims. Having concluded that the plaintiffs have proven that "the consequences of the foreign state's conduct were 'reasonably certain' . . . to occur," *Roth*, 78 F. Supp. 3d at 402, the

reasonable awards as to each plaintiff for economic loss, pain and suffering, solatium, and punitive damages will be determined next.

### 2. *Economic Losses and Medical Expenses*

The fifteen plaintiff service members to whom the defendants are liable for assault and battery seek to recover for "medical expenses" and "economic losses." Compl. ¶ 42. "Unlike damages for pain and suffering, lost earnings are not hard to quantify, and the Court will not excuse plaintiffs' failure to support the claim for lost earnings with competent evidence." *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 71 (D.D.C. 2015). The plaintiffs in this case have provided no evidence supporting any such recovery. *Cf. Hill*, 328 F.3d at 684 ("[A] plaintiff may recover damages for past economic losses if such losses are reasonably proved." (internal quotation marks omitted)). Consequently, they have "failed to meet the minimum evidentiary threshold supporting their respective claims for economic damages," and no economic damages may be awarded. *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 41 (D.D.C. 2016). Similarly, the plaintiffs have submitted no evidence as to their medical expenses, so no medical expenses damages may be awarded either. *Cf. Levin v. Islamic Republic of Iran*, 529 F. Supp. 2d 1, 20 (D.D.C. 2007) ("[P]laintiffs, through their own testimony, have reasonably proven the costs incurred as a result of past medical expenses."); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 275 (D.D.C. 2003) ("[Plaintiff] has also requested damages for his past medical expenses and has 'reasonably proven' these expenses through the testimony of his mother.").

### 3. *Pain and Suffering*

As discussed above, the defendants are liable to the fifteen service members injured in the Khobar Towers bombing—Todd Akins, George C. Anthony, Charles Blank, John Gaydos,

Kevin James Hurst, Thomas R. Lawrence, Gregory Eric Leinenbach, Nicholas L. MacKenzie, Jason Porter Remar, Jerry Timothy Sasser, Frank David Sills III, Matthew G. Spicer, Alan Jeffrey Wade, Tracy Matthew Winter, and Eric Dale Ziegler—for battery, assault, and intentional infliction of emotional distress, but in view of the bar on multiple recoveries, the plaintiffs may only recover damages reflecting the single harm underlying these three torts.  *See EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002) ("[I]t 'goes without saying that the courts can and should preclude double recovery by an individual.'" (quoting *Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 333 (1980))); *Medina v. District of Columbia*, 643 F.3d 323, 326 (D.C. Cir. 2011) ("[A] party 'cannot recover the same damages twice, even though the recovery is based on two different theories.'" (quoting *Bank One, Tex., N.A. v. Taylor*, 970 F.2d 16, 34 (5th Cir. 1992))); *Valore*, 700 F. Supp. 2d at 77 ("The Court notes that these plaintiffs who have claimed assault, battery, and IIED may recover under only one of any such theories, as multiple recovery is prohibited.").  The plaintiffs contend in their "uncontroverted . . . affidavits," *Roth*, 78 F. Supp. 3d at 386, that they experienced significant physical and psychological injuries as a result of the attack.  "[W]hen assessing damages for surviving victims of terrorist hostilities," the "baseline assumption" is that "'persons suffering injuries in terrorist attacks are entitled to $5 million in damages.'"  *Kaplan*, 213 F. Supp. 3d at 35 (quoting *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 12 (D.D.C. 2012)).  This baseline may be moderated either upward or downward.  An upward departure would be warranted "in the presence of 'severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, including partially lost vision and hearing, or were mistaken for dead,' or downward in the face of 'minor shrapnel injuries or minor injury from small-arms fire.'"  *Id.* at 35–36 (quoting *Valore*, 700 F. Supp. 2d at 84) (citation omitted and

alteration adopted). In the case of "victims who 'suffered severe emotional injury without physical injury, this Court has typically awarded the victim $1.5 million.'" *Id.* at 36 (quoting *Harrison*, 882 F. Supp. 2d at 49).

Review of the plaintiffs' "uncontroverted factual allegations" in their affidavits, *Roth*, 78 F. Supp. 3d at 386, and, where available, exhibits, demonstrates that nine plaintiffs—Todd Akins, George C. Anthony, Charles Blank, John Gaydos, Gregory Eric Leinenbach, Jerry Timothy Sasser, Frank David Sills III, Alan Jeffrey Wade, and Eric Dale Ziegler—each suffered the types of "severe physical injuries, such as compound fractures, serious flesh wounds, and scars from shrapnel, as well as lasting and severe psychological pain," *Khaliq v. Republic of Sudan*, 33 F. Supp. 3d 29, 33 (D.D.C. 2014), *aff'd sub nom. Owens*, 864 F.3d 751, that warrant the baseline $5 million award. Accordingly, the nine plaintiffs—Todd Akins, George C. Anthony, Charles Blank, John Gaydos, Gregory Eric Leinenbach, Jerry Timothy Sasser, Frank David Sills III, Alan Jeffrey Wade, and Eric Dale Ziegler—are each entitled to an award of $5,000,000 for their pain and suffering as survivors of the bombing.

With respect to five service member plaintiffs—James Hurst, Nicholas L. MacKenzie, Jason Porter Remar, Matthew G. Spicer, and Tracy Matthew Winter—who, according to their "uncontroverted factual allegations," *Roth*, 78 F. Supp. 3d at 386, "suffer[ed] severe emotional injury accompanied by relatively minor physical injuries," "downward departures to a range of $1.5 to $3 million are warranted," *Khaliq*, 33 F. Supp. 3d at 33. Hurst's physical injuries were limited to cuts on his feet from broken glass, for which he was treated the day after the attack, and he has "bulging and protruding discs" that he "believe[s] may have been caused at least in part by the blast." Hurst Decl. ¶¶ 4–5, 7. MacKenzie's physical injuries were similarly limited to cuts from broken glass, for which he "received first aid." MacKenzie Decl. ¶¶ 4, 6. Remar

sustained "numerous cuts and abrasions" when the force of the blast "carried [him] along the ground for about 15 or 20 feet," and, after seeking treatment, "woke up in a nearby Saudi hospital" where "they did not think [he] was hurt too bad." Remar Decl. ¶¶ 4–6. Spicer describes having "received some first aid for my leg wounds." Spicer Decl. ¶ 7. Winter "received eleven stitches" for cuts from "pieces of flying glass," as well as "additional treatment" after returning to the United States. Winter Decl. ¶¶ 4–6. Hurst, MacKenzie, Remar, Spicer, and Winter have averred that they have experienced serious psychological after-effects from the attack. *See* Hurst Decl. ¶¶ 7–8; MacKenzie Decl. ¶¶ 7, 9–10; Remar Decl. ¶¶ 7–9; Spicer Decl. ¶¶ 9–10; Winter Decl. ¶¶ 6–8.

"When calculating damages amounts, 'the Court must take pains to ensure that individuals with similar injuries receive similar awards.'" *Khaliq*, 33 F. Supp. 3d at 33 (quoting *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 54 (D.D.C. 2007)). Following *Braun*, 228 F. Supp. 3d at 84 (awarding $2.5 million for "physical and psychological injuries" where victim's physical injuries were "more akin to minor injuries from shrapnel or small-arms fire"), James Hurst, Nicholas L. MacKenzie, Jason Porter Remar, Matthew G. Spicer, and Tracy Matthew Winter are each entitled to an award of $2,500,000 for their pain and suffering as survivors of the bombing.

As described *supra* Part I.C.13, plaintiff Thomas R. Lawrence suffered "severe emotional injury without physical injury," for which "this Court has typically awarded the victim $1.5 million." *Kaplan*, 213 F. Supp. 3d at 36 (quoting *Harrison*, 882 F. Supp. 2d at 49). Accordingly, he is entitled to an award of $1,500,000 for his pain and suffering as a survivor of the Khobar Towers attack.

### 4. *Solatium*

The twenty-four family members of service members injured in the Khobar Towers bombing—Andrew P. Blank, Linda Kay Blank, Nathan Blank, Barbara Gaydos, Ethan Gaydos, Elizabeth Gaydos, Andrea Jo Grimson, Robyn Elizabeth Lawrence, Bruce Russell Lawrence, Kimi Lawrence, Joy Leinenbach, Deborah Millraney, Jerry Timothy Sasser, Sr., Jason Allen Sasser, Deborah Homs, Cathy Eunha Kim Spicer-Lindsy, Christian William Spicer, Christopher G. Spicer, Bonnie C. Wade, Michael Kevin Wade, Thomas H. Wade, Richard M. Williams, Angela Rose, and Nancy Kilfoyle—seek solatium damages to compensate for the emotional distress they experienced as family members of victims of the attack.  Compl. ¶¶ 50–52.  "District Court judges have discretion under 28 U.S.C. § 1608(e) to grant solatium awards based on the particular facts of each case, subject to abuse-of-discretion review for errors of law, clearly erroneous factual findings, and faulty reasoning."  *Fraenkel*, 892 F.3d at 351.  Citing Judge Lamberth's "seminal opinion explaining the origins and particulars of solatium damages" in *Flatow v. Islamic Republic of Iran*, the D.C. Circuit has explained that "'[s]olatium is traditionally a compensatory damage which belongs to the individual heir personally for injury to the feelings and loss of decedent's comfort and society,'" and was an award that "'began as a remedy for the loss of a spouse or a parent,'" but is now understood to include the loss of a child or a sibling as well.  *Id.* at 356 (quoting *Flatow*, 999 F. Supp. 1, 29 (D.D.C. 1998)).  Solatium is not, however, reserved for those who have suffered the death of a loved one: "in the context of distress resulting from injury to loved ones—rather than death—courts have applied a framework where 'awards are valued at half of the awards to family members of the deceased.'"  *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 39 (D.D.C. 2012) (Lamberth, J.) (quoting *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26 n.10 (D.D.C. 2011) (Lamberth, J.)); *see also*

*Valore*, 700 F. Supp. 2d at 85 (Lamberth, J.) ("Relatives of surviving servicemen received awards valued at half of the awards to family members of the deceased."); *Heiser I*, 466 F. Supp. 2d at 269 (Lamberth, J.) ("[F]amilies of victims who have died are typically awarded greater damages than families of victims who remain alive." (quoting *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 75 (D.D.C. 2006) (Lamberth, J.))); *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 38 (D.D.C. 2001) (Lamberth, J.), *aff'd sub nom. Bettis v. Islamic Republic of Iran*, 315 F.3d 325 (D.C. Cir. 2003) (awarding a lower sum where the victim "returned alive").

"Mental anguish, bereavement and grief resulting from" an immediate family member's death or injury "constitutes the preponderant element of a claim for solatium." *Fraenkel*, 892 F.3d at 356–57 (quoting *Flatow*, 999 F. Supp. at 30) (alteration adopted); *see also Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 83 (D.D.C. 2011) ("A claim of solatium seeks compensation for the 'mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as a result of the decedent's death, as well as the harm caused by the loss of the decedent, society and comfort.'" (quoting *Belkin*, 667 F. Supp. 2d at 22)). In determining the appropriate amount to compensate victims' family members for emotional distress, "the Court may look to prior decisions awarding damages . . . for solatium." *Acosta*, 574 F. Supp. 2d at 29. Solatium damages, by their nature, are "unquantifiable," *Moradi*, 77 F. Supp. 3d at 72, and, therefore, this Court has developed a commonly accepted standardized framework, known as the *Heiser* damages framework, for solatium damages. *Heiser I*, 466 F. Supp. 2d at 269; *see Roth*, 78 F. Supp. 3d at 403 (noting the "framework has been adopted by other courts as an appropriate measure of solatium damages for the family members of victims of state-sponsored terror" (citing *Valore*, 700 F. Supp. 2d at 85)). Though the *Heiser* framework is not mandatory, *Fraenkel*, 892 F.3d at 361 ("District Court judges invariably must exercise

discretion in determining damages awards under the FSIA. There is no statutory basis for concluding that district courts *must* award solatium damages in the amounts that *Heiser* found commonly granted."), it is adopted here in the interest of consistency, especially given that *Heiser* also stemmed from the Khobar Towers bombing.

As a baseline, the *Heiser* framework awards "spouses of deceased victims . . . approximately $8 million, while parents and children received $5 million and siblings received $2.5 million." *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 15 (D.D.C. 2010). As noted, "families of victims who have died are typically awarded greater damages than families of victims who remain alive." *Heiser I*, 466 F. Supp. 2d at 269 (quoting *Haim*, 425 F. Supp. 2d at 75). Accordingly, "in the context of distress resulting from injury to loved ones—rather than death—courts have applied a framework where 'awards are valued at half of the awards to family members of the deceased,'" *i.e.*, $2,500,000 to parents of surviving victims, *Wultz*, 864 F. Supp. 2d at 39 (citing authorities), and "[c]hildren of a surviving victim receive $1.5 million on average," *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 28 (D.D.C. 2014).

These numbers serve only as a baseline from which the Court may deviate in order to compensate for specific circumstances. *See Fraenkel*, 892 F.3d at 362 ("While past solatium awards from comparable cases are appropriate sources of guidance for district courts, different plaintiffs (even under FSIA) will prove different facts that may well (and should) result in different damage awards." (internal quotation marks omitted)). Factors militating in favor of an award enhancement generally fall into one of three categories: "evidence establishing an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack

which made the suffering particularly more acute or agonizing." *Oveissi*, 768 F. Supp. 2d at 26–27. "Decisions to deviate from the starting points provided by the *Heiser* framework are committed to the discretion of the particular court in each case . . . ." *Id.* at 26.

The twenty-four plaintiff family members have each suffered from seeing the effects of the Khobar Towers bombing on their loved ones. In light of the *Heiser* framework, the damages awards for plaintiff spouses are addressed first, followed by parents and children, and then siblings.

### a.    Spouses

Linda Kay Blank, Barbara Gaydos, Cathy Eunha Kim Spicer-Lindsy, Joy Leinenbach, Nancy Kilfoyle, and Robyn Elizabeth Lawrence were each married to a plaintiff service member at the time of the attack. As described above, each has averred to their fear for their spouses' physical well-being in the immediate aftermath of the attack as they waited for information on the status of their spouses, and the emotional toll of the psychological after-effects of the attack once their spouses returned home. *See* Linda Blank Decl. ¶¶ 4–11; Barbara Gaydos Decl. ¶¶ 4–13; Cathy Spicer-Lindsy Decl. ¶¶ 4–9; Joy Leinenbach Decl. ¶¶ 6–9; Kilfoyle Decl. ¶¶ 4–9; Robyn Lawrence Decl. ¶¶ 4–8. Though Blank, Gaydos, Leinenbach, and Lawrence remain married to their spouses, and Kilfoyle and Spicer-Lindsy have since divorced, each has, in their own way, experienced the Khobar Towers bombing and its effect on their family as a life-changing event. "[L]ike many" spouses of the victims of terrorist attacks, they have "suffered through an unimaginable ordeal," but their affidavits do not present a "basis to warrant a deviation from th[e] standard award." *Valencia*, 774 F. Supp. 2d at 16.[15] Accordingly, Linda

---

[15]    Divorce does not warrant a downward deviation, particularly where the after-effects of the attack were a primary cause of the divorce. *See Spencer*, 71 F. Supp. 3d at 28–29 (holding that, despite divorce, "[t]he Court need not depart from its usual solatium damages framework as to spouses, however, because evidence . . . indicated that [the couple] were married at the time of the bombing and remained married until 2005, [the victim's spouse]

Kay Blank, Barbara Gaydos, Joy Leinenbach, and Nancy Kilfoyle are each entitled to an award of $4,000,000. A "proportional[]" downward deviation from the *Heiser* framework is appropriate where "a proposed solatium award would exceed the pain and suffering award received by a surviving victim." *Spencer*, 71 F. Supp. 3d at 28. Accordingly, Cathy Eunha Kim Spicer-Lindsy, whose ex-husband was awarded $2,500,000, is entitled to an award of eighty percent that amount, or $2,000,000, and Robyn Elizabeth Lawrence, whose husband was awarded $1,500,000, is entitled to an award of eighty percent that amount, or $1,200,000.

### b. Parents

Jerry Timothy Sasser, Sr., Deborah Homs, Kimi Lawrence, Bruce Russell Lawrence, Angela Rose, Bonnie C. Wade, Thomas H. Wade, and Richard M. Williams are each parents of service members who were stationed at the Khobar Towers at the time of the bombing. Each has described their fear for their respective children upon learning about the attack, and the ongoing struggle of witnessing, and helping their children cope with, the psychological after-effects of the attack. *See* Jerry Sasser Sr. Decl. ¶¶ 4–8; Homs Decl. ¶¶ 4–9; Kimi Lawrence Decl. ¶¶ 4–10; Bruce Lawrence Decl. ¶¶ 4–8; Rose Decl. ¶¶ 4–10; Bonnie Wade Decl. ¶¶ 4–10; Thomas Wade Decl. ¶¶ 4–9; Williams Decl. ¶¶ 5–10. The harm suffered by each of these plaintiffs is consistent with that suffered by many parents of victims of terrorism. *Valencia*, 774 F. Supp. 2d at 16. Jerry Timothy Sasser, Sr., Deborah Homs, Bonnie C. Wade, Thomas H. Wade, and Richard M. Williams are each entitled to an award of $2,500,000. Applying the proportional downward departure as described in *Spencer*, 71 F. Supp. 3d at 28, Angela Rose is entitled to an award of

_____

suffered compensable emotional trauma as a result of the attack, and at least one witness attributed the dissolution of their marriage to the after effects of the attack"); *Daliberti*, 146 F. Supp. 2d at 26 (awarding the same amount in solatium damages to spouses of terror victims irrespective of whether the spouses had divorced or separated). *But see Baker*, 775 F. Supp. 2d at 84 (Facciola, M.J.) ("I do not believe I can award [a spouse] the same amount, however, that would be awarded had the marriage not ended in divorce.").

$1,250,000, and Kimi Lawrence and Bruce Russell Lawrence are entitled to an award of $750,000—half the awards for their respective sons.

### c. Children

Nathan Blank, Ethan Gaydos, Elizabeth Gaydos, and Christian William Spicer are each children of plaintiff service members who were injured in the Khobar Towers attack. Although each was very young at the time of the bombing, each suffered emotional distress and other adverse effects of the impact of the bombing on their respective fathers as they were growing up. *See* Nathan Blank Decl. ¶¶ 5–6; Ethan Gaydos Decl. ¶¶ 5–9; Elizabeth Gaydos Decl. ¶¶ 4–8; Spicer-Lindsy for Christian Spicer Decl. ¶¶ 5–7. The harm suffered by each of these plaintiffs is consistent with that suffered by many children of victims of terrorism, *Valencia*, 774 F. Supp. 2d at 16, and, accordingly, Nathan Blank, Ethan Gaydos, and Elizabeth Gaydos are each entitled to an award of $1,500,000. Applying the proportional downward departure as described in *Spencer*, 71 F. Supp. 3d at 28, Christian William Spicer is entitled to an award of $750,000, or thirty percent of the amount awarded to his father.

### d. Siblings

Andrew P. Blank, Deborah Millraney, Andrea Jo Grimson, Christopher G. Spicer, and Michael Kevin Wade are, and Jason Allen Sasser, whose estate is represented by Kimberly Watters Sasser, was, each siblings of plaintiff service members who were injured by the Khobar Towers bombing. Each has described the emotional distress they experienced when they first learned of the bombing and the struggle of witnessing the psychological after-effects of the attack on their respective brothers. *See* Andrew Blank Decl. ¶¶ 5–7; Millrany Decl. ¶¶ 4–5; Christopher Spicer Decl. ¶¶ 4–8; Grimson Decl. ¶¶ 4–7; Michael Wade Decl. ¶¶ 5–9; Jason Sasser Decl. ¶¶ 6–7. The harm suffered by each of these plaintiffs is consistent with that

suffered by many siblings of victims of terrorism. *Valencia*, 774 F. Supp. 2d at 16. Andrew P. Blank, Deborah Millraney, Michael Kevin Wade, and the estate of Jason Allen Sasser are each entitled to an award of $1,250,000. Applying the proportional downward departure as described in *Spencer*, 71 F. Supp. 3d at 28, Christopher G. Spicer is entitled to an award of $625,000 and Andrea Jo Grimson is entitled to an award of $375,000, or one-quarter the amounts awarded to their respective brothers.

### 5. *Punitive Damages*

The plaintiffs' request for punitive damages of at least $500 million, Compl. ¶ 56, is barred by controlling precedent. Punitive damages are awarded not to compensate the victims, but to "punish outrageous behavior and deter such outrageous conduct in the future." *Kim*, 87 F. Supp. 3d at 290 (quoting *Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 105 (D.D.C. 2012)); *see also* RESTATEMENT (SECOND) OF TORTS § 908(1). Such punitive damages have been awarded under 28 U.S.C. § 1605A(c) in prior cases against the defendants for their role in the Khobar Towers attack. *See, e.g.*, *Rimkus*, 750 F. Supp. 2d at 184–85; *Heiser II*, 659 F. Supp. 2d at 29–31. In *Owens*, however, the D.C. Circuit vacated an award of punitive damages against Sudan for its role in a 1998 terrorist attack, holding that "the FSIA terrorism exception does not retroactively authorize the imposition of punitive damages against a sovereign for conduct occurring before the passage of § 1605A" in 2008. 864 F.3d at 812; *see also id.* at 818 ("[A] plaintiff proceeding under either state or federal law cannot recover punitive damages for conduct occurring prior to the enactment of § 1605A."). As in *Owens*, where the conduct at issue occurred in 1998, the 1996 Khobar Towers attack preceded the 2008 enactment of § 1605A. Accordingly, the plaintiffs are not entitled to punitive damages.

### 6. *Pre-Judgment Interest*

The plaintiffs also request an award of pre-judgment interest on the compensatory damage awards. Pls.' Mem. Supp. Pls.' Damages Mot. ("Pls.' Damages Mem.") at 5–6, ECF No. 25-1. "[W]hether pre-judgment interest is to be awarded is subject to the discretion of the court and equitable considerations." *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997) (quoting *Motion Picture Ass'n of Amer., Inc. v. Oman,* 969 F.2d 1154, 1157 (D.C. Cir. 1992) (alteration adopted)). "Prejudgment interest is an element of complete compensation," *West Virginia v. United States*, 479 U.S. 305, 310 (1987), and "is often necessary for full compensation," *Oman*, 969 F.2d at 1157, where the plaintiff experiences a "delay in payment resulting from the litigation," *Oldham*, 127 F.3d at 54.

The twenty-four family member plaintiffs are not entitled to pre-judgment interest on their solatium damages. When denying pre-judgment interest on solatium damages in *Oveissi*, Judge Lamberth explained that "[i]n adopting the *Heiser* framework, this Court determined that the values set by that scale represent the appropriate level of compensation, regardless of the timing of the attack." 768 F. Supp. 2d at 30 n.12; *see also Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 54 (D.D.C. 2016) (noting solatium damages "do not typically require prejudgment interest because they are 'designed to be fully compensatory'" (quoting *Wyatt*, 908 F. Supp. 2d at 232)). As in that case, where "the Court s[aw] no reason to deviate from its standard practice" and award such interest on solatium damages, *Oveissi*, 768 F. Supp. 2d at 30 n.12, the instant plaintiffs, who urged the adoption of the *Heiser* framework for solatium damages, Pls.' Damages Mem. at 2–5, have not provided any reason why awards under that framework are insufficient to provide "complete compensation," *West Virginia*, 479 U.S. at 310.

For similar reasons, pre-judgment interest is also denied to the fifteen service member plaintiffs. The plaintiffs do not suggest that awards under the *Heiser* framework are insufficient

such that prejudgment interest is necessary. *See* Pls.' Damages Mem. at 2–6. Moreover, their

awards compensate for harm, particularly psychological, that is ongoing, rather than, for

example, a "taking or detention of land, chattels or other subjects of property," RESTATEMENT

(SECOND) OF TORTS § 913(1), from a one-off event. Additionally, according to the Restatement,

pre-judgment interest "is not allowed upon an amount found due for bodily harm, [or] for

emotional distress." *Id.* § 913(2). The plaintiffs cite *Reed* for the proposition that "courts in this

Circuit have awarded prejudgment interest in cases where plaintiffs were delayed in recovering

compensation for their injuries—including, specifically, where such injuries were the result of

targeted attacks perpetrated by foreign defendants," *Reed*, 845 F. Supp. 2d at 214 (quoting *Pugh*

*v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216, 263 (D.D.C. 2008)); *see also*

*Owens v. Republic of Sudan*, 71 F. Supp. 3d 252, 261 (D.D.C. 2014); *Estate of Doe v. Islamic*

*Republic of Iran*, 943 F. Supp. 2d 180, 184 n.1 (D.D.C. 2013), but *Reed* also noted that courts

"must take pains to ensure that individuals with similar injuries receive similar awards," 845 F.

Supp. 2d at 214 (internal quotation marks omitted). Although pre-judgment interest has been

awarded in other FSIA suits, pre-judgment interest has not been awarded to service member

plaintiffs in other suits arising from the Khobar Towers bombing. *See Valencia*, 774 F. Supp. 2d

1; *Heiser II*, 659 F. Supp. 2d 20; *Heiser I*, 466 F. Supp. 2d 229; *Blais*, 459 F. Supp. 2d 40.

Accordingly, for the reasons discussed above, and in the interest of consistency, pre-judgment

interest will not be awarded to the fifteen service member plaintiffs.

## IV.  CONCLUSION

For the reasons outlined above, the plaintiffs' motion for default judgment is granted in

part and denied in part. Due to their support for Saudi Hezbollah's bombing of the Khobar

Towers on June 25, 1996, both defendants are jointly and severally liable for the pain and

suffering inflicted on the fifteen plaintiff service members present at Khobar Towers at the time of the bombing and the emotional distress inflicted on the twenty-four plaintiff family members. While the claims of plaintiff service member Christopher Galletto are dismissed, the remaining plaintiffs are awarded monetary damages in the following amounts:

- Service member plaintiffs Todd Akins, George C. Anthony, Charles Blank, John Gaydos, Gregory Eric Leinenbach, Jerry Timothy Sasser, Frank David Sills III, Alan Jeffrey Wade, and Eric Dale Ziegler, who each suffered both severe physical and emotional injury, are each entitled to $5,000,000 in pain and suffering damages;

- Service member plaintiffs James Hurst, Nicholas L. MacKenzie, Jason Porter Remar, Matthew G. Spicer, and Tracy Matthew Winter, who each suffered less severe physical and emotional injury, are each entitled to $2,500,000 in pain and suffering damages;

- Service member plaintiff Thomas R. Lawrence, who suffered emotional injury, is entitled to $1,500,000 in pain and suffering damages;

- Plaintiff spouses Linda Kay Blank, Barbara Gaydos, Joy Leinenbach, and Nancy Kilfoyle are each entitled to $4,000,000 in solatium damages;

- Plaintiff spouse Cathy Eunha Kim Spicer-Lindsy is entitled to $2,000,000 in solatium damages;

- Plaintiff spouse Robyn Elizabeth Lawrence is entitled to $1,200,000 in solatium damages;

- Plaintiff parents Jerry Timothy Sasser, Sr., Deborah Homs, Bonnie C. Wade, Thomas H. Wade, Richard M. Williams are each entitled to $2,500,000 in solatium damages;

- Plaintiff parent Angela Rose is entitled to $1,250,000 in solatium damages;

- Plaintiff parents Kimi Lawrence and Bruce Russell Lawrence are each entitled to $750,000 in solatium damages;

- Plaintiff children Nathan Blank, Ethan Gaydos, and Elizabeth Gaydos are each entitled to $1,500,000 in solatium damages;

- Plaintiff child Christian William Spicer is entitled to $750,000 in solatium damages;

- Plaintiff siblings Andrew P. Blank, Deborah Millraney, Michael Kevin Wade, and the estate of Jason Allen Sasser, represented by Kimberly Watters Sasser, are each entitled to $1,250,000 in solatium damages;

- Plaintiff sibling Christopher G. Spicer is entitled to $625,000 in solatium damages;

- Plaintiff sibling Andrea Jo Grimson is entitled to $375,000 in solatium damages.

Thus, the total damages award is $104,700,000.

An appropriate Order accompanies this Memorandum Opinion.


Date: September 10, 2018

_____
BERYL A. HOWELL
Chief Judge